Argued and submitted December 2, 1986, affirmed February 10, 1987

# TRUITT BROTHERS, INC.,
*Respondent/Cross-Appellant,*

*v.*

# DEPARTMENT OF REVENUE,
*Appellant/Cross-Respondent.*

(OTC 2063; SC S32391)

732 P2d 497

Carl N. Byers, Judge.

Dave L. Canary, Assistant Attorney General, Salem, argued the cause and filed the briefs for appellant/cross-respondent. With him on the appellant's brief was Elizabeth S. Stockdale, Assistant Attorney General, Salem.

James C. Griggs, of Harland, Ritter, Saalfeld, Griggs & Gorsuch, Salem, argued the cause and filed the briefs for respondent/cross-appellant.

JONES, J.

## JONES, J.

Defendant, Department of Revenue (department), appeals from a decision of the Oregon Tax Court reducing the assessed valuation of plaintiff's (taxpayer) fruit and vegetable cannery located in Salem, Oregon. The property was on the 1981-82 tax roll at a true cash value of $7,705,010. The hearings officer for the department reduced this amount by $412,410. The tax court determined the true cash value of the property to be $5,602,393. 10 OTR 111 (1985). Taxpayer cross-appeals, alleging that the tax court should have set the assessed value of the property at $3,463,000.

This case concerns the true cash value of the major portions of taxpayer's food processing plant as of January 1, 1981. The plant is located on the bank of the Willamette River near the core of the city of Salem. The main processing building was originally constructed in 1914 and has been used since that time as a food processing plant. Due to changes in the industry and other circumstances, the plant has expanded by utilizing warehouses and parking spaces across the street. Although the prime connection with the warehouses is an overhead conveyer system, the nature of the arrangement requires additional handling of empty and full cans. The main processing building contains a mezzanine area used for empty can storage and feeding into the system, and a basement area, part of which was remodeled for use as an office and cafeteria.

The cannery primarily processes pears, green beans and stone fruits. In the years just prior to the assessment date in question, taxpayer found it necessary essentially to replace the pear line to retain its pear customers. Other additions and improvements since the owners purchased the property in 1973 have resulted in an up-to-date processing system. The primary deficiencies claimed by taxpayer with regard to the machinery and equipment are not age or efficiency but the cramped and circuitous layout dictated by the buildings in which the plant is located.[1] Taxpayer claims that the canning industry has fallen on hard times and, of most importance, that the plant values are diminished greatly by economic obsolescence.

---

[1] This describes functional obsolescence, not economic obsolescence. *See Reynolds Metals Co. v. Dept. of Rev.*, 299 Or 592, 603-04, 705 P2d 712, *modified on reconsideration* 300 Or 250, 709 P2d 710 (1985).

The tax court commented: "This case is a classic illustration of the problems encountered in valuing industrial property for ad valorem tax purposes. The disparate positions of the parties, both in attitude and results, would leave reasonable [persons] scratching their heads." 10 OTR at 112. The tax court judge did more than scratch his head. He carefully evaluated the evidence and reached a reasonable conclusion, which we affirm.

Taxpayer's appraisers viewed the property as having value only to the extent that it produces income or could be sold in the marketplace. Looking at the projected income and considering what investors would pay for that benefit, taxpayer's appraisers arrived at a valuation by comparing these factors with the cost of replacing taxpayer's plant from a used equipment market and the sales price of other food processing plants which have sold.

The department claimed that the sales of other food processing plants were not comparable and sought to establish valuation by determining what would be just compensation to taxpayer for the loss of the plant. The department used a valuation process relying primarily upon reproduction cost of the plant new, less depreciation.

Taxpayer arrived at a final valuation figure of $3,463,000 using the comparable sales approach adjusted to reflect economic obsolescence of the plant and equipment. The department arrived at a final valuation of $7,021,064 using the reproduction cost new less depreciation method. The tax court determined that the reproduction cost new for the buildings, yard, improvements, machinery and equipment was equal to $7,506,460, but then deducted $2,457,307 for economic obsolescence, arriving at a value of $5,049,153, plus land of $553,240, for a total tax valuation of $5,602,393.

We review anew upon the record. ORS 305.445. The issue is the property's "true cash value"; that is, its "market value * * * as of the assessment date" of January 1, 1981. ORS 308.205.[2] OAR 150-308.205-(A)(1)(a) provides:

---

[2] ORS 308.205 provides in relevant part:

"True cash value of all property, real and personal, means the market value of the property as of the assessment date. True cash value in all cases shall be determined by methods and procedures in accordance with rules adopted by the

"Market Value as a basis for true cash value shall be taken to mean the highest price in terms of money which a property will bring if exposed for sale in the open market, allowing a period of time typical for the particular type of property involved and under conditions where both parties to the transaction are under no undue compulsion to sell or buy and are able, willing and reasonably well-informed."

■ ■   As with all property subject to the *ad valorem* real property tax, the final objective of the appraisal is to find the market value. There are three basic appraisal methods for determining the market value of real property: (1) utilizing comparable sales or market data, (2) capitalization of income, and (3) the cost approach. Which of these is used depends upon the character of the property and the availability of data necessary to apply the respective methods. *Chapin v. Dept. of Rev.,* 290 Or 931, 936-37, 627 P2d 480 (1981).

We turn first to the question whether valuation of taxpayer's property can be established on the basis of comparable sales. The department's regulation, OAR 150-308.205-(A)(1)(b), states:

"Immediate market value of property exists when there are sales of comparable property at times and places which are reasonably relevant under the existing circumstances. * * * When the market data approach is not applicable, true cash value shall be determined by estimating just compensation for loss to the owner of the unit of property."

Taxpayer acquired the subject property in 1973. At that time there were 30 canneries operating in the West. By the end of 1983 only 7 of the 30 canneries were still operating. As mentioned, taxpayer's cannery primarily processes pears, green beans and stone fruits. On the date of the appraisal, there were only three canneries in the entire United States which packed a combination of pears, green beans and stone fruits: Castle & Cooke, also located in Salem; Northwest Pack in Vancouver, Washington; and taxpayer's facility. The tax court found and we agree that taxpayer's facility and the Castle & Cooke facility are remarkably similar not only as to their

---

Department of Revenue and in accordance with the following:

"(1) If the property has no immediate market value, its true cash value is the amount of money that would justly compensate the owner for loss of the property."

location and the types of fruits and vegetables they process, but also as to their layout and the equipment used in their processing lines as well as to their hourly production rate and annual production capacity.[3] The tax court found that the Castle & Cooke plant, while larger, was in fact comparable to the subject property, stating that "on the whole it would appear to be as close a match as could be hoped for in such a specialized industry." 10 OTR at 116.

The department disputes the comparability of this sale. The department first claims that the Castle & Cooke transaction was not a purchase of an operating cannery, but that the buyer was merely seeking additional warehouse space. However, we find that the cannery was purchased as an operating facility and that the buyer was seeking to obtain pear-processing capability in addition to warehouse space. In any event, what intentions the purchaser eventually had in mind for use of the property does not destroy its comparability.

The department next claims that the comparability of the amount paid for the cannery is not reflective of the open market because of the requirement that the buyer process pears that the seller was obligated to take from certain growers. The tax court found and we agree that in light of the buyer's desire to get into the pear-processing business, and the absence of any evidence that such processing was not at market rates, this commitment did not distort the purchase price.

■ The department also claims that the sale was not a free and open market sale because the seller made it known that it would close the plant if not able to sell it as an operating facility. We find that the seller was not compelled to sell and that the sale was to a willing buyer by a willing seller. Whether the unit is sold as an operating unit or a recently closed one

---

[3]

"Comparison - Productive Capacities

| | Truitt Bros., Inc. | | Castle & Cooke, Inc. | |
| Product | 4 Yr. Ave. Tons Run | Rate Per Hour | Rate Per Hour | Comparative Tons |
| --- | --- | --- | --- | --- |
| Beans | 12,370 | 14.0 | 15.0 | 13,253 |
| Pears | 16,081 | 15.0 | 12.0 | 12,864 |
| Plums | 1,600 | 9.0 | 13.0 | 2,311 |
| Cherries | 1,374 | 6.0 | 11.0 | 2,519 |
| Total Tons | 31,425 | | | 30,947" |

does not necessarily destroy comparability, and in this case did not.

The department also challenges the timing of the Castle & Cooke sale, claiming that it occurred in 1985 and not at a comparable time. The Castle & Cooke facility sold in April 1982 for $5 million. It had been on the market for sale for some time preceding the appraisal date on taxpayer's property. Negotiations for the sale of that facility commenced near the date of the assessment of taxpayer's property. While there is some disagreement between the parties as to whether there was actually a sale in 1982 or whether the sale occurred in 1985 when title was transferred, we conclude that the date of the sale for comparable sales purposes occurred in 1982.

■■■■ The question arises whether the sale of the Castle & Cooke facility some 15 months after the appraisal date of taxpayer's property was within a "reasonably relevant time under the existing circumstances." OAR 150-308.205-(A)(1)(b). It usually takes from one to two years to market an industrial facility like taxpayer's cannery and we conclude that sales of similar property accomplished within that period are sales occurring within a "reasonably relevant time under the existing circumstances" for purposes of OAR 150-308.205-(A)(1)(b). As such, the sale of the Castle & Cooke facility was a comparable sale for purposes of establishing the market value of taxpayer's property. A sale of property within a reasonable time of the assessment, while not conclusive, is very persuasive of market value. The department raises other challenges to the Castle & Cooke sale, which we deem have no merit. The Castle & Cooke sale was a valid comparable sale for market data evaluation purposes.

■■■ Usually, one sale does not make a market. The basic assumption of the sales comparison approach is that there is sufficient data and information available to provide a pattern or range of indicated value. The sales comparison approach is intended to reflect "the market" and not just one or two buyers. But when the market for industrial food processing plants is so small, with only three comparable plants in existence, one sale of a practically identical property in the same community may be an adequate indicator of market value. We recognize that the widely utilized appraisal text introduced in evidence in this case states:

"When the market contains an insufficient number of transactions to create value patterns, the application of the [market sales] approach may be limited or inappropriate. Large, special purpose properties are *often insufficiently* similar to other properties that have sold recently to allow an appraiser to impute value from them. For such properties, using one or both of the other appraisal approaches usually proves more reliable." American Institute of Real Estate Appraisers, The Appraisal of Real Estate 311 (8th ed 1983) (emphasis added).

But in this case taxpayer's plant and the Castle & Cooke plant were sufficiently similar. This case represents the exception to the general rule.

■     Even though we conclude that the Castle & Cooke sale may be used to determine the value of taxpayer's property, we also examine the other two approved methods for additional assistance. We agree with the tax court that the income approach cannot be applied in this case due to the difficulty of distinguishing income attributable to nontaxable and intangible assets. The tax court primarily relied on the0cost approach to determine the true cash value of taxpayer's property. Both parties submitted appraisals using the cost approach and arrived at widely varying conclusions. The department's appraiser used the reproduction cost new approach and applied figures from the used equipment market in order to estimate depreciation. He provided a detailed listing of all of the plant assets, adjusting for freight, installation, wiring and engineering. Taxpayer's appraisers used a reproduction cost used approach. Under this approach, prices for used equipment are obtained and adjusted for installation, wiring and freight cost. Taxpayer arrived at a figure of $3,463,000. The department arrived at a figure of $7,021,064.

The primary reason for the wide disparity in the values determined by the two parties was their treatment of economic obsolescence. The parties agreed that economic obsolescence is present in the improvements on the land due to the fact that the land has a higher and better use than for a food processing plant. The land is better suited for small commercial development. Beyond this point they disagree both as to how to measure the amount of economic obsolescence attributable to the land having a higher and better use and as to whether there is any measurable economic obsolescence.

The tax court described economic obsolescence as "that ghostly apparition, * * * [a] spirit whose presence may be discerned but whose intangible nature defies measurement, it confuses and chills the marketplace." 10 OTR at 118. The American Institute of Real Estate Appraisers' text, *supra,* sets forth the means by which economic, or its synonymous term, external, obsolescence can be measured:

> "External obsolescence, which is the result of the diminished utility of a structure due to negative influences from outside the site, is always incurable. * * *
>
> "An appraiser can use either of two methods to measure external obsolescence. The appraiser uses the method that is supported by the best market evidence. The two methods are (1) capitalizing the rent loss attributable to the negative influence [income capitalization approach], or (2) comparing sales of similar properties, some of which are subject to the negative influence and some that are not. If pertinent sales data are abundant, the second method is preferable to the first." *Id.* at 487-89.

In attempting to prove that its facility was subject to economic obsolescence, taxpayer presented evidence of operating losses in fiscal years 1981 and 1982, produce sales and cost comparisons, industrial forecasts, a per capita consumption analysis for the industry's products, a market share analysis indicating market share losses for Northwest canneries, a comparative analysis of freight rates and an analysis of labor cost. The Department did not present any evidence on this issue, contending that there was no reliable evidence for determining economic obsolescence of the plant and that taxpayer's evidence was speculative.

The tax court adopted taxpayer's appraisers' estimate of economic obsolescence. Without detailing the evidence on this subject, we agree with the appraisers' estimate that the economic obsolescence is $2,457,307. This is remarkably close to the economic obsolescence demonstrated by the Castle & Cooke sale. The department's depreciated reproduction cost valuation of the Castle & Cooke property was $7,300,000, and that property sold for $5 million, demonstrating an economic obsolescence of $2,300,000.

From our review of the record, applying both the

comparable sales approach and the cost approach, we conclude that the true cash value of taxpayer's property for tax year 1981-82 is $5,602,393.

The tax court is affirmed. No costs awarded.