IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

ARMSTRONG WORLD INDUSTRIES,    )
    )
    Plaintiff,    )    TC-MD 100671B
    )
    v.    )
    )
COLUMBIA COUNTY ASSESSOR    )
and DEPARTMENT OF REVENUE,    )
State of Oregon,    )
    )
    Defendants.    )    **DECISION**

Plaintiff appeals the real market value of industrial property improvements identified as Account 13220 (subject property) for the 2009-10 tax year. A trial was held in the Tax Courtroom, Salem, Oregon on August 8, 2011. Andrew Hall (Hall), Property Tax Director, Ryan, Inc., appeared and testified on behalf of Plaintiff. Joseph A. Laronge, Senior Assistant Attorney General, appeared on behalf of Defendant Department of Revenue (Department). Rob Motley (Motley), Senior Industrial Appraiser, and Don Brutke (Brutke), Principal Industrial Appraiser, both testified on behalf of the Department. Defendant Columbia County Assessor did not appear at trial because the land value is not at issue in this matter.

Plaintiff's Exhibit 1 was offered and received over the Department's objection. The Department objected to the admission of those parts of Plaintiff's Exhibit not supported by expert witness testimony. The court admitted Plaintiff's Exhibit 1, noting that the Department's objection would be considered in weighing the evidence. The Department's Exhibits A, B, and Rebuttal Exhibit D were received without objection. Plaintiff objected to the Department's Rebuttal Exhibit C because that document was prepared by Plaintiff during 2008, but the date of preparation is unknown; the Department's Rebuttal Exhibit C includes figures from 2006, 2007,

and estimates for 2008. The court admitted the Department's Rebuttal Exhibit C over Plaintiff's

objection, noting that the objection would be considered in weighing the evidence.

I. STATEMENT OF FACTS

Motley testified that the subject property, which is located in St. Helens, Oregon, is used

by Plaintiff to manufacture ceiling tiles. He testified that the majority of the main building is the

"board mill" in which raw materials, including "mineral wool, water, perlite, paper, clay, and

starch," are combined with chemicals to form a slurry that is then shaped into boards, pressed,

and dried. (*See* Def's Ex A at 6-7.) In the "fabrication mill," the boards are cut into tiles, passed

through a "line of flames," and processed through several stages of painting and precise cutting.

(*See id.*) Finally, the tiles are painted, stacked, shrink-wrapped, and palletized for shipment.

(*See id.*) Motley testified that the entire process utilizes large, specialized equipment including a

"forming line," a "dryer," a "line of flames," a "super saw," and an "equalizer saw." Motley

testified that the subject property also features several large silos in which materials such as

perlite, clay, and starch are kept, and a warehouse. He testified that the majority of the facility,

including the machinery and equipment, is highly specialized and could not easily be converted

to another use, such as a warehouse.

Hall testified that, as of January 1, 2009, the subject property was one of five

manufacturing facilities owned and operated by Plaintiff in the United States. He testified that,

subsequent to January 1, 2009, two of those facilities have closed: one in Mobile, Alabama in

March 2009 and another in Beaver Falls, Pennsylvania in July 2010. (Ptf's Ex 1, "Closed

Locations" at 1, 2.)

Plaintiff is a publicly-traded company and annually files Form 10-K as required by the

Securities and Exchange Commission (SEC). (*See* Def's Ex A at 12.) Motley testified that he

reviewed Plaintiff's 2008 Form 10-K for information about Plaintiff. (*See id.*) Motley testified that 40.4 percent of Plaintiff's net sales are allocated to the building products division, which is the division that includes production of ceiling tiles. (*See id.* at 14, 292.) Motley testified that, for Plaintiff as a whole, 10 percent of ceiling tiles are to the residential market and 90 percent are to the commercial market; for the subject property, 95 percent of the ceiling tiles are to the commercial market and 5 percent are to the residential market. (*See id.* at 23) The commercial market for ceiling tiles consists of offices, hospitals, schools, churches, and government buildings. (*See id.* at 23.) Plaintiff's ceiling tile market share is 70 percent; the market share of Plaintiff's largest competitor, US Gypsum (USG), is 25 percent. (*See id.* at 22-23.)

A.      *Plaintiff's real market value evidence*

Hall testified that he is not a registered appraiser; he works for Ryan LLC, a property tax consulting service. He testified that his duties for Ryan LLC include "managing the property tax process" for Plaintiff. Hall testified that Ryan LLC files all returns and reviews assessments. He testified that he is not an appraisal expert. He testified that Plaintiff agrees with the Department's cost approach, with the exception of the calculation for economic, or external, obsolescence. Hall testified that the Department's 2009 value transmittal sheet "revised 8/17/2009," states economic obsolescence of $1,792,980 for a "total real market value" of $28,376,360; however, the Department's value transmittal sheet "revised 6/29/2010," states economic obsolescence of $4,588,770, for a "total real market value" of $26,003,040. (Ptf's Ex 1, "Valuation" at 3; Def's Ex A at 75.)

Hall testified that the difference between the income approach and the cost approach represents economic obsolescence. He testified that he provided "ASA Appraising M & E" to support Plaintiff's contention that the income approach must be developed and reviewed in order

to adequately value the subject property under the cost approach. Hall testified that Plaintiff's 2009 budgeted production was 138,000,000 square feet, or 58 percent of the total capacity of 239,423,040 square feet, which is lower than any of the four previous years. (Ptf's Ex 1, "Capacity Utilization" at 1.) In 2008, Plaintiff utilized 73 percent of total capacity. (*Id.*) Plaintiff requests economic obsolescence of 39 percent ($11,766,043) for a total real market value of $21,545,650. (Ptf's Compl at 4.) Hall reiterated in his closing statement Plaintiff's position concerning economic obsolescence. He testified that, according to Marshall and Swift, depreciation is divided into three categories: physical, functional, and external (economic). Hall testified that economic obsolescence is a separate consideration from the other forms of depreciation.

B.    *The Department's real market value evidence*

Motley testified that he considered the three approaches of valuation. He did not use the sales comparison approach because, as of January 1, 2009, "there were eight known properties engaged in similar operations in the United States, five of which were owned by [Plaintiff] and three of which were owned by [USG]." (Def's Ex A at 16.) Motley testified that, if any sale of the subject property were to occur, it would be through a merger or acquisition. (*See id.*) "A hypothetical sale of this nature is addressed in [the Department's] income approach * * *." (*Id.*)

Motley testified that the Department received income and expense information from Plaintiff; however, he did not use the discounted cash flow method or the direct capitalization methods, rejecting each as unreliable in this case. (*See id*. at 11.) Motley testified that he did not use the discounted cash flow method in part because many of Plaintiff's expenses such as the sales force, research and development, management, and human resources, were shared by the various facilities owned by Plaintiff. (*See id.*) He testified that he did not rely on the direct

capitalization method because the subject property "is not readily adaptable to a general market use * * *." (*Id.*) Motley testified that he valued the subject property using the stock and debt approach as well as the cost approach. He testified that he gave the most weight, 93 percent, to the cost approach. Brutke testified that, ideally, all three approaches to value are utilized. He testified that the Department did not have sufficient information to complete a discounted cash flow analysis and that approach would not be reliable in this case.

1.      *Cost approach*

Motley testified that the cost approach involves determining what it would cost to rebuild the subject property as of January 1, 2009, taking into account any physical, functional, and external (economic) depreciation. (*See id*. at 18.) Motley testified that he used a "Trended Investment Cost Method," which he characterized as a "hybrid between a cost and comparable sales approach." (*See id*. at 21.) He looked at the market for comparable machinery and equipment, but found that the machinery and equipment involved is very specific to the industry; there are no good comparable sales. Motley testified that he used the asset list provided by Plaintiff, determined a replacement cost new based on the price from the original manufacturer, and applied depreciation factors from Marshall and Swift Cost Estimating Service. (*See id.* at 21, 190-219.) He testified that he selected a few larger items of machinery and equipment and tested the depreciated value that he determined against the market by calling the manufacturer and inquiring about the actual cost new as of January 1, 2009. Motley testified that, for some items, the actual market value was higher than his depreciated value and, for others, it was lower; he made adjustments for those differences. Motley testified that he also asked manufacturers about the market for used equipment and the economic life of equipment; he determined that

/ / /

there is virtually no market for used equipment. Motley determined an improvements value of $31,252,000 under the cost approach. (*Id*. at 21.)

2. *Economic obsolescence under the cost approach*

The Department's appraisers defined economic obsolescence as " 'a temporary or permanent impairment of the utility or salability of an improvement or property due to negative influences outside the property' (The Appraisal of real estate, 12th Edition)." (*Id*. at 22.) Motley and Brutke both testified that they found no evidence that the subject property was affected by economic obsolescence as of January 1, 2009. (*See id.* at 23.) Motley testified that he found no economic obsolescence, in part, because the cost and income approaches indicated very similar values.[1] Motley testified that price increases in the industry that made up for lagging production also support his determination that the subject property was not affected by economic obsolescence as of January 1, 2009.

Brutke testified that he visited the subject property with Motley in February 2011, helped complete the asset list, and worked on the economic obsolescence portion of the appraisal. Brutke testified that it is not necessary to complete an income approach to measure economic obsolescence. He testified that, according to the Appraisal Institute, there are three ways to measure economic obsolescence: (1) paired sales analysis; (2) market extraction; and (3) discounted cash flow on income lost. (*See id*. at 25.) Brutke testified that, ideally, a discounted cash flow analysis would have been used; however, that analysis would have been unreliable in this case due to Plaintiff's Chapter 11 bankruptcy in 2006.

Brutke testified that, in his analysis of economic obsolescence, he looked first to the whole ceiling tile industry, to see where products are going and for indicators of the market.

---

[1] Motley revised his determination of the indicated value under the stock and debt approach during trial.

(*See* Def's Ex A at 596.) He testified that he looked at what was known and knowable as of January 1, 2009, generally fourth quarter 2008 data. Brutke testified that, in 2008, Plaintiff represented 70 percent of the ceiling tile market; its second largest competitor was USG. (*See id.* at 23.) Brutke testified that Plaintiff had record net sales in 2007 and 2008 in the building products division and that USG also enjoyed record sales in 2008. (*See id.* at 24, 610.) He testified that the market for commercial ceiling tiles is very elastic; there are few competitors or substitute products in the market. (*See id.* at 24; Def's Rebuttal Ex D at 9.) Brutke testified that Plaintiff increased prices in 2006, 2007, and 2008; Plaintiff's total price increase from 2005 through 2008 was 26 percent during the same period that its production decreased. (*See* Def Ex A at 22, 531, 536, 611.) He testified that Plaintiff realized an operating profit in the first half of 2008. (Def's Rebuttal Ex D at 11.) The Department's appraisers concluded, "[i]t appears that the production declines have been more than offset by pricing increases." (Def's Ex A at 22.)

Brutke testified that, at the end of 2008, the housing bubble burst and crisis struck the financial markets. He testified that the commercial market did not drop as hard as the residential market and it was forecasted to recover sooner; as of January 1, 2009, there was a significant drop from the peak of the commercial market, but experts were expecting a quick, full recovery. (*See id*. at 538 - 543.[2]) Brutke testified that only five percent of the subject property sales of ceiling tiles are to the residential market and those sales are for remodels, not new homes; thus, there was no link between Plaintiff's sales and the residential market. (*See id.* at

/ / /

---

[2] Brutke testified that the Department's Exhibit A, pages 538-543, include a graph from Global Insights Forecast showing decline from 2008 to early 2010 in the market for commercial and health care construction, but forecasting improvement in 2010; a Global Insights Forecast for January 2009 comparing the residential and commercial building markets; a comparison of 2002 to 2009, adjusted for inflation, showing that the commercial and government construction markets were not as bad as the residential private markets; the RISI forecast for the pulp/paper and construction industries tracking and forecasting U.S. real GDP; and a Global Insight Construction Forecast Chained Price Index showing that the commercial market was not as bad as the residential market.

23.) He testified that, of the 2008 subject property sales to the North American commercial market, 70 percent were for remodels and 30 percent were for new construction. (*Id.* at 23, 596.)

Brutke testified that, in 2008, the subject property's primary markets were Asia and the Western United States. (*See id*. at 25.) He testified that Plaintiff's net sales increased by 14.4 percent to Pacific Rim markets from 2007 to 2008. (*See id.* at 623.) Brutke testified that, as of January 1, 2009, the subject property was Plaintiff's only West Coast plant. (*See id.* at 604.) He testified that USG's plants are all located in the Midwest and South. (*See id.* at 786.) Brutke testified that the subject property is important because it is the only West Coast plant.

2.      *Stock and debt approach*

Motley testified that he considered the stock and debt approach to be reflective of the market given that Plaintiff is a publicly traded company; he used information from Plaintiff's 2008 10-K to determine a value under the stock and debt approach. (*Id*. at 11.) Motley testified that, in 2008, Plaintiff's total market value was $2,591,740,405. (*Id.* at 13.) He testified that he used a stock price of $19/share, the average price during the last three months of 2008.[3] Motley testified that he subtracted the value of non-taxable assets for "value attributable to taxable assets" of $806,418,735. (*Id.* at 13-14.) He testified that he determined the percent of sales attributable to U.S. operations to be 58 percent; the percent percentage of sales attributable to the building products division to be 40.4 percent;[4] and the percentage of sales attributable to the subject property as compared with the other four U.S. plants to be 21 percent,[5] for a "final

/ / /

---

[3] Motley testified that, during 2008, Plaintiff's stock ranged from $13 to $30 per share.

[4] *See* Def's Ex A at 292 ("2008 Consolidated Net Sales by Segment").

[5] *See* Def's Ex A at 521 ("Plaintiff's Manufacturing Operation Report").

allocated value" of $39,581,724 for the subject property.[6] (*Id.* at 14-15.) He subtracted the value of land and personal property for a total improvements value of $34,409,414. (*Id.*)

Motley testified on cross examination that he used $172,939 ("sales units") rather than $67,224 ("net sales EITF") in his stock and debt approach. (*See id*. at 521.) He testified that, based on correction of that error, the revised "final allocated value" to the subject property should be $15.9 million. (*See id*. at 15.) Motley testified that his revised improvements value under the stock and debt approach is $10.9 million. (*See id.*)

3.    *Reconciliation*

Motley testified on cross examination that his new reconciled improvements value for the subject property, taking into account the correction to his value under the stock and debt approach, is $29.5 million. He testified that he gave about 93 percent weight to the cost approach and seven percent to stock and debt approach; he testified that was the weight that he gave to each approach at the time that he completed his appraisal and he did not change those weights in determining a revised reconciled value. Motley testified that the weight given to each approach was based, in part, on the many problems associated with the stock and debt approach.[7]

C.    *Requested Values*

The 2009-10 roll real market value of the subject property, sustained by the board of property tax appeals, was $28,786,240, with $25,643,890 attributed to improvements.[8] (Ptf's Compl at 3.) Plaintiff's Complaint states that Plaintiff was "granted 15% obsolescence," but "believe[s] that additional economic obsolescence is warranted * * *. Therefore, [Plaintiff]

---

[6] Based on the sales attributable to the building products division and the to the subject property, Motley testified that he determined a sales percentage of 8.5 percent for the subject property. (Def's Ex A at 15.)

[7] During testimony, Motley cited *Delta Air Lines Inc. v. Dept. of Rev.*, 13 OTR 372 (1995) in support of the weaknesses of the stock and debt approach.

[8] The 2009-10 maximum assessed value was $45,912,510. (Ptf's Compl at 3.)

request[s] a 39% reduction on manufacturing machinery and equipment which leads to a final

value * * * of $21,545,650." (Ptf's Compl at 4.) Subtracting the land value of $3,142,350,

which is not at issue, Plaintiff's requested improvements value is $18,403,300. (*See id.* at 3.) In

support of that request, Plaintiff notes that "production has steadily declined and reached an all-

time low this year with a utilization percentage of 61%." (*Id.* at 4.) Hall stated at trial that the

Department's revised determination of the indicated value under the stock and debt approach,

$10.9 million, supports Plaintiff's claim that the subject property was affected by economic

obsolescence as of January 1, 2009, and supports Plaintiff's requested value. The Department

requests a 2009-10 improvements real market value of $29.5 million for the subject property.

## II. ANALYSIS

The issue before the court is the improvements real market value of the subject property

for the 2009-10 tax year. ORS 308.411(1)[9] states, in pertinent part, that

> "the real market value of an industrial plant shall be determined for ad valorem
> tax purposes under ORS 308.205, 308.232 and 308.235 utilizing the market data
> approach (sales of comparable properties), the cost approach (reproduction or
> replacement cost of the plant) or the income approach (capitalization of income)
> or by two or more approaches."

Real market value is defined as "the amount in cash that could reasonably be expected to be paid

by an informed buyer to an informed seller, each acting without compulsion in an arm's-length

transaction occurring as of the assessment date for the tax year." ORS 308.205(1). The

assessment date for the 2009-10 tax year was January 1, 2009. ORS 308.007; ORS 308.210(1).

"In all proceedings before * * * a magistrate of the tax court * * * a preponderance of the

evidence shall suffice to sustain the burden of proof. The burden of proof shall fall upon the

party seeking affirmative relief * * *." ORS 305.427. A "[p]reponderance of the evidence

---

[9] All references to the Oregon Revised Statutes (ORS) are to 2007.

means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971).

A.      *Plaintiff's real market value evidence*

Taxpayers "must establish by competent evidence what the appropriate value of the property was as of the assessment date in question." *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002) (citing ORS 305.427). Competent evidence includes "testimony from licensed professionals such as appraisers, real estate agents[,] and licensed brokers." *Hausler v. Multnomah County Assessor*, TC-MD No 110509D, WL 5560673 at *4 (Nov 15, 2011). Plaintiff's only witness, Hall, testified that he is not an appraiser and has no appraisal expertise. Plaintiff failed to provide competent evidence in support of its requested value reduction. Plaintiff's appeal must, therefore, be denied.

B.      *The Department's real market value evidence*

"When the determination of real market value * * * is an issue before the tax court, the court has jurisdiction to determine the real market value * * * on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412. The Department requests that the improvements real market value of the subject property be increased to $29.5 million. In support of that requested value, the Department presented evidence of value using both the cost approach and the stock and debt approach.

1.      *Cost approach*

Hall stated that Plaintiff is in agreement with the Department's valuation under the cost approach, with the exception of economic obsolescence. Thus, the court will focus on that aspect of the Department's analysis under the cost approach. Economic or "external" obsolescence is "a loss in value caused by factors outside a property. It is often incurable."

Appraisal Institute, *Appraisal of Real Estate* 442 (13th ed 2008).[10] There are "three primary methods of measuring external obsolescence[:]" allocation of market-extracted depreciation; analysis of market data; and capitalization of an income loss. *Id.* at 443-44. This court has described economic obsolescence as a "ghostly apparition * * *. Like some spirit whose presence may be discerned but whose intangible nature defies measurement, it confuses and chills the marketplace." *Truitt Brothers, Inc. v. Dept. of Rev.*, 10 OTR 111, 118 (1985), *aff'd*, 302 Or 603, 732 P2d 497 (1987).

Plaintiff argues that the subject property was affected by economic obsolescence as of January 1, 2009, pointing to both Plaintiff's reduced level of production from previous years and also to the disparity in the values indicated by the Department's two approaches. Even if the court were to accept Plaintiff's claim that the subject property was affected by economic obsolescence as of January 1, 2009, Plaintiff "failed to offer evidence providing guidance as to how to determine the correct amount of economic obsolescence to deduct from the computed reproduction cost new." *KRC Rolls v. Lane County Assessor*, TC-MD No 070169D, WL 3021088 at *17 (Jul 31, 2008). Furthermore, the Department presented persuasive evidence in support of its conclusion that the subject property did not suffer from economic obsolescence as of January 1, 2009, including Plaintiff's 70 percent market share of the ceiling tile market; Plaintiff's record net sales in 2007 and 2008 in the building products division; the elasticity of the commercial ceiling tile market; and the subject property's proximity to Asian and Western U.S. markets relative to others plants. Thus, the court finds that the Department's improvements value of $31,252,000 under the cost approach is supported.

---

[10] "External obsolescence, which is the result of the diminished utility of a structure due to negative influences from outside the site, is always incurable." *Truitt Brothers, Inc. v. Dept. of Rev.*, 302 Or 603, 732 P2d 497 (1987) (quoting American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* 487-89 (8th ed 1983)).

2.      *Stock and debt approach; reconciliation*

This court has described the stock and debt approach as "a surrogate measure," the premise of which "is that for publicly-traded companies, the total value of the company's equity (stock) and liabilities (debt) is the market's estimate of the value of the firm's assets. The method entails a number of assumptions and applications which are fraught with difficulties." *Delta Air Lines, Inc. v. Dept. of Rev. (II)*, 13 OTR 372, 381 (1995). Motley determined a revised value under the stock and debt approach of $10.9 million. In recognition of the "difficulties" associated with the stock and debt approach, Motley testified that he gave only seven percent weight to the stock and debt approach, attributing 93 percent weight to the cost approach, for a revised reconciled value of $29.5 million. Motley testified that his reconciliation is based on his appraisal judgment and there is no evidence to suggest that the weight given to each approach should be otherwise. Accordingly, the court accepts the Department's revised reconciled value of $29.5 million for the subject property improvements as of January 1, 2009.

### III.  CONCLUSION

After carefully considering the evidence and testimony, the court finds that Plaintiff failed to prove by a preponderance of the evidence that any reduction in the value of the subject property is merited. Plaintiff's appeal must, therefore, be denied. The court further finds that the Department's 2009-10 improvements real market value of $29.5 million for the subject property is supported by the evidence. Now, therefore,

/ / /

/ / /

/ / /

/ / /

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied.

IT IS FURTHER DECIDED that the 2009-10 improvements real market value of

identified as Account 13220 was $29.5 million.

Dated this ____ day of December 2011.

 

                                 ALLISON R. BOOMER
                                 MAGISTRATE PRO TEMPORE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Magistrate Pro Tempore Allison R. Boomer on December 30, 2011. The Court filed and entered this document on December 30, 2011.*