IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

KYLE A. RUTHARDT,                         )
                                          )
            Plaintiff,                    )    TC-MD 150193N
                                          )
      v.                                  )
                                          )
WASCO COUNTY ASSESSOR,                    )
                                          )
            Defendant.                    )    **FINAL DECISION**

      This Final Decision incorporates without change the court's Decision, entered September

30, 2015.  The court did not receive a statement of costs and disbursements within 14 days after

its Decision was entered.  *See* TCR MD 16 C(1).

      Plaintiff appeals the real market value of property identified as Account 17048 (subject

property) for the 2014-15 tax year.  A trial was held on August 6, 2015, in the Oregon Tax

Courtroom in Salem, Oregon.  Plaintiff appeared and testified on his own behalf.  Basil Beeler

(Beeler), the subject property's seller, testified by telephone on behalf of Plaintiff.  Traci

Ruthardt (Ruthardt) testified on behalf of Plaintiff.  Darlene K. Lufkin (Lufkin), Chief Appraiser

for Defendant, appeared and testified on behalf of Defendant.  Plaintiff's Exhibits 1 through 8

and Defendant's Exhibit A were received without objection.

## I.  STATEMENT OF FACTS

      The subject property is a 0.55 acre parcel of land located on the Pine Hollow Reservoir

(Pine Hollow) (*See* Ptf's Ex 2; Def's Ex A at 2, 5.)  Pine Hollow is located in Wasco County,

south of The Dalles and north of Maupin.  (*See* Def's Ex A at 15.)  In her appraisal report,

Lufkin described the subject property's immediate market area as a "recreational community [of]

mostly seasonal occupied homes, vacation rentals, as well as campground use and development

FINAL DECISION  TC-MD 150193N                                                                    1

* * *." (*Id.* at 8.) The subject property is a level lot improved with a small shed, and water and septic. (*Id.* at 2, 5.) The subject property is "waterfront," although there is a 10-foot high "dike" or "berm" on the subject property's waterfront. (Ptf's Ex 1; Def's Ex A at 8.)

A.  *Plaintiff's Purchase of the Subject Property*

The subject property's seller, Beeler, testified that he first listed the subject property for sale in 2010 for $150,000, and it was listed on and off for a total of approximately 571 days before Plaintiff purchased it in September 2014. (*See* Ptf's Ex 8; Def's Ex A at 6.) He testified that he initially tried to sell the subject property for its tax roll real market value, but he did not receive any offers. Beeler testified that he thought it was hard to sell the subject property because of the dike blocking its water view. Beeler testified that he initially listed the subject property with a "local" realtor and then switched to a realtor based in Clackamas, Oregon, who is also his nephew's wife. (*See* Def's Ex A at 7.) He testified that he was not "motivated" to sell; rather, he wanted to sell the subject property to gain some extra money for his retirement.

Plaintiff testified that he purchased the subject property for $87,500, or $3.05 per square foot, in September 2014. (*See* Ptf's Ex 8; Def's Ex A at 12.) He testified that he was looking for a vacation spot and found the subject property on Craigslist. Plaintiff testified that the asking price was $89,500. (*See* Ptf's Ex 8; Def's Ex A at 6.) He testified that he made an offer, Beeler counter-offered, and they negotiated before ultimately agreeing upon a price of $87,500. Plaintiff and Beeler each testified that they did not know each other prior to the sale of the subject property. Ruthardt testified that she believes Beeler thoroughly tested the subject property's market over four years.

Lufkin testified that she did not rely on the sale of the subject property because she did not consider it to be a "typical" sale. She determined that "the list and sale amount demonstrates

a seller motivation not typical in this market." (Def's Ex A at 4.) Lufkin testified that the subject property was first listed in 2010 during "a time of economic uncertainty * * *." (*Id.*) She testified that the annual number of sales in the subject property's market area declined from 36 sales in 2006 to 8 sales in 2010. She testified that there were 11 sales in 2011, 19 sales in 2012, 15 sales in 2013, and 17 sales in 2014. Lufkin testified that she did not think the subject property's listing realtor had "geographic competency" because she was not local. (*See id.* at 4, 7.) Lufkin testified that one sale does not make a market.

B.      *The Impact of the Dike on Real Market Value*

Plaintiff testified that the dike blocks the water view from the subject property. (*See* Ptf's Ex 4.) He testified that most of the other "waterfront" properties on Pine Hollow have direct access to the reservoir via land sloping into the water. Plaintiff testified that whenever he builds a house on the subject property, he will have to construct a second story to enjoy the water view and that will result in additional cost and additional property taxes. Plaintiff testified that an independent fee appraiser prepared an appraisal of the subject property for lending purposes. (*See* Ptf's Ex 2B.) He testified that the appraiser noted that "the view of the lake is blocked by the dike" and concluded a real market value of $88,000 as of August 18, 2014. (*See id.*)

Beeler testified that he owns the property next to the subject property and it is also situated behind the dike. He testified that when he built his house he had to "go up two stories" in order to gain a water view. Beeler testified that the additional cost of constructing a two-story house was approximately $80,000 to $85,000. He testified that the first story of his house is a garage and an extra room.

Ruthardt testified that she believes a true waterfront lot on Pine Hollow would be worth approximately $150,000, but building on the subject property will require an additional $80,000

cost to construct a second story to enjoy the lake view. She testified that location is everything and the subject property has a lesser value than true waterfront properties because of its location.

Lufkin testified that the subject property's listing described it as a "[b]eautiful lake view property * * *." (Def's Ex A at 5, 8.) She wrote in her appraisal report that

> "[t]he subject property is a waterfront property and has a berm making the land developable and protected from flooding. * * * Access to the waterfront is different for all these lots with varying topography, views and all waterfront properties have a public access strip. This market is not sufficient enough to measure any monetary differences for these variations nor has any adjustments from area market activity demonstrated a difference for waterfront property location, view or access differences."

(*Id.* at 8.) Lufkin testified that she disagrees with an adjustment for the berm because it "can be overcome with development choices," as demonstrated by Beeler's house. (*See id.* at 9.)

C.      *Defendant's Real Market Value Evidence*

Lufkin testified that she used the "market related cost approach" to determine the subject property's real market value. (*See* Def's Ex A at 3.) She testified that she determined the subject property's bare land real market value based on Defendant's 2000 Pine Hollow Land Study. (*See id.* at 8.) Lufkin testified that she classified the subject property as Tier 1 "Waterfront," which had a base land value of $120,000 in 2000. (*See id.*) She testified that she trended that value to 2014 and determined the subject property's bare land value was $148,640, to which she added $11,000 for onsite developments, for a total land real market value of $159,640. (*See id.*) Lufkin added an improvements value of $3,330 for a total real market value of $162,970. (*Id.*)

Lufkin testified that she also considered a "market land analysis," but concluded that insufficient market evidence was available. (*See* Def's Ex A at 12.) She testified that she identified one other sale of "Tier 1" land close to the January 1, 2014, assessment date: a 0.77-acre parcel that sold for $156,000, or $4.32 per acre in June 2013. (*Id.*)

Lufkin testified that she also considered the "land residual method," which she conceded is not the best method, but it provides support when the available market evidence is limited. (*See* Def's Ex A at 13.) Excluding the subject property, Lufkin determined a value range of $96,920 to $195,870, or $5.62 to $7.18 per square foot, for the land residual values of five waterfront sales that occurred between June 2013 and October 2014. (*See id.*)

Plaintiff and Ruthardt each testified that they think the subject property should be considered a "Tier 2" property rather than a "Tier 1" property under Defendant's land classification system. (*See* Ptf's Ex 1.) Plaintiff testified that the values of "Tier 2" properties are more accurate for the subject property; they ranged from $4.51 to $5.20 per square foot based on Defendant's "land residual" calculations. (*See* Ptf's Ex 2.)

## II. ANALYSIS

The issue presented in this case is the 2014-15 real market value of the subject property. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor*, TC-MD 020869D, WL 21263620 at *2 (Mar 26, 2003). Real market value is defined in ORS 308.205(1), which states:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."[1]

The assessment date for the 2014-15 tax year was January 1, 2014. *See* ORS 308.007; 308.210.

The real market value of property must be determined in accordance with methods and procedures adopted by the Department of Revenue. *See* ORS 308.205(2). The value of property must be considered using the three approaches to value: (1) the cost approach, (2) the sales comparison approach, and (3) the income approach. *See* OAR 150-308.205(A)(2)(a). Although

---

[1] The court's references to the Oregon Revised Statutes (ORS) are to 2013.

all three approaches may not be applicable in a given case, all three approaches must be considered. *See id*.

Plaintiff has the burden of proof and must establish his case by a preponderance of the evidence. *See* ORS 305.427. "Preponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). Plaintiff "must provide competent evidence of the [real market value] of [his] property." *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002). "Competent evidence includes appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents, and licensed brokers." *Danielson v. Multnomah County Assessor*, TC-MD 110300D, WL 879285 (Mar 13, 2012). If Plaintiff's "evidence is inconclusive or unpersuasive, [Plaintiff] will have failed to meet the burden of proof * * *." *Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990). This court "has jurisdiction to determine the real market value * * * on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

A.    *Subject Property Purchase Price as Evidence of Real Market Value*

Plaintiff relies primarily on his purchase price to establish the subject property's real market value as of January 1, 2014.[2] "A recent sale of the property in question is important in determining its market value. If the sale is a recent, voluntary, arm's length transaction between a buyer and seller, both of whom are knowledgeable and willing, then the sales price, while certainly not conclusive, is very persuasive of the market value." *Kem v. Dept. of Rev.* 267 Or 111, 114, 514 P2d 1335, 1337 (1973). "In the absence of data indicating that 'the price paid was

---

[2] Plaintiff also provided an appraisal report prepared for lending purposes that supported his requested real market value, but the author of the appraisal report was not available to testify, so the court places little weight on the appraisal report.

out of line with other market data material, we believe [a recent sale] to be one of the best and most satisfactory standards for the estimation of actual value although, admittedly, it is not conclusive.' " *Ernst Brothers Corp. v. Dept. of Rev.*, 320 Or 294, 300, 882 P2d 591 (1994), citing *Equity Land Res. v. Dept. of Rev.*, 268 Or 410, 415, 521 P2d 324 (1974).

The sale of the subject property must be "recent." "Whether a transaction is so recent as to be persuasive of present value will depend upon the similarity of conditions affecting value at the time of the transaction and conditions affecting value at the time of the assessment." *Sabin v. Dept. of Rev.*, 270 Or 422, 426-27, 528 P2d 69 (1974). The subject property sold in September 2014, nine months after the January 1, 2014, assessment date. Neither party presented evidence of changes in market conditions during that time period. Moreover, Lufkin used sales from September and October 2014 in her land residual method of valuation and did not make any time adjustments. The court concludes that the sale of the subject property was "recent" as of the assessment date.

The sale of the subject property must be "arm's length." Generally, a transaction between related parties is not "arm's length." *See, e.g., Magno v. Dept. of Rev.*, 19 OTR 139, 142 (2006) (stating that "related-party transactions lack[ed] the necessary arm's-length characteristics required to establish value"). Plaintiff and Beeler each testified that they did not know each other prior to the sale of the subject property. No evidence was presented to rebut their testimony. The court concludes that the sale of the subject property was arm's-length.

The sale of the subject property must be "voluntary." A sale may not be voluntary if it involved "duress, death, [or] foreclosures * * *." *See* OAR 150-308.205-(A)(2)(c) (listing several examples of "nontypical market conditions of sale"); *see also Oldenburg v. Wasco County Assessor*, TC-MD 150145N, WL 4724813 at *4 (Aug 10, 2015) (discussing why the

court has been reluctant to consider sales following foreclosure as persuasive evidence of real market value).

Lufkin testified that she did not consider the subject property sale to be "typical" due to "a seller motivation not typical in this market." (Def's Ex A at 4.) She identified the subject property's listing and sale price as evidence of Beeler's atypical motivation. Beeler testified that he was not "motivated" to sell the subject property; rather, he wanted some additional funds for his retirement. The subject property sale was neither a short sale nor a sale following foreclosure. No evidence was presented to indicate that Beeler was under duress or financial hardship when he sold the subject property. The court concludes that the sale of the subject property was voluntary. Beeler was a willing seller and Plaintiff a willing buyer.

Lufkin also asserted that Beeler relied on a realtor who lacked "geographic competency" in the subject property's market area, suggesting that Beeler was not a knowledgeable seller. Even if the court were to accept Lufkin's conclusion, Beeler testified that he initially listed the subject property with a "local" realtor. The evidence presented in this case supports the conclusion that the subject property was adequately exposed to the market over a period of several years with two different realtors, one local and one located in Clackamas, Oregon.

The court concludes that Plaintiff's purchase of the subject property for $87,500 was a recent, voluntary, and arm's-length transaction as of the January 1, 2014, assessment date, and therefore provides persuasive evidence of the subject property's real market value.

B.    *Defendant's Real Market Evidence*

Even though the court finds that the sale of the subject property provides persuasive evidence of real market value in this case, the court will consider whether Defendant's evidence

/ / /

indicates that "the price paid was out of line with other market data material[.]" *See Ernst*, 320 Or at 300 (internal quotation marks omitted).

Lufkin considered the subject property sale to be atypical because the subject property was first listed during "a time of economic uncertainty and the last list[ed] during a time [of] economic recovery * * *." (Def's Ex A at 4.) She testified regarding the number of sales in the subject property's market area each year from 2006 through 2014, demonstrating that 2010 was the low point in that time period. Lufkin's testimony described general market conditions and did not explain how the subject property's listing or sale was atypical as compared with the general market.

Lufkin's additional evidence comprised her "market related cost approach," her "market land analysis," and her "land residual" analysis. In her market related cost approach, Lufkin determined a bare land real market value for the subject property based on a study of land sales in Pine Hollow conducted in 2000, trended forward to 2014. The court finds that market data collected in 2000 does not provide persuasive evidence of the subject property's real market value as of January 1, 2014.

In her market land analysis, Lufkin considered a sale of "Tier 1" waterfront land on Pine Hollow on June 13, 2013. That property was 0.77 acres and sold for $156,000, or $4.32 per square foot, as compared with the subject property, a 0.55-acre parcel that sold for $3.05 per square foot. As Lufkin noted, "[u]sually, one sale does not make a market." *Truitt Brothers, Inc. v. Dept. of Rev.*, 302 Or 603, 609, 732 P2d 497 (1987). The unadjusted price of the sale Lufkin identified does not provide more persuasive evidence of the subject property's real market value than the sale of the subject property itself. Moreover, Plaintiff provided a persuasive explanation of why the subject property would sell for less than other waterfront

parcels on Pine Hollow: a house situated on the subject property will not have lake views from the first floor, only from the second floor. Beeler testified that he had to build a second story to his house in order to gain lake views and the cost was approximately $80,000 to $85,000.

Finally, Lufkin completed a land residual analysis, in which she determined the value attributable to the land in sales of improved parcels by subtracting the tax roll improvements values from the total sales prices. Lufkin conceded that the residual method is not the best method of valuation, and the court agrees. "[T]his court has generally rejected the residual method * * * [in] which * * * roll values of the other property [are subtracted] from the purchase price, because roll values are the product of mass appraisal techniques whereby statistical trends are applied each year to generate values for tax purposes." *Bennett Family Trust v. Deschutes County Assessor*, TC-MD 120096C, WL 6621234 at *5 (Dec 19, 2012).

The evidence presented by Lufkin fails to establish that Plaintiff's purchase price for the subject property was out of line with other market data.

### III. CONCLUSION

After careful consideration, the court finds that the subject property's real market value as of January 1, 2014, was $87,500, based on Plaintiff's purchase price. The court concludes that Plaintiff's appeal should be granted. Now, therefore,

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is granted. The 2014-15 real market value of property identified as Account 17048 was $87,500.

Dated this ____ day of October 2015.

_____
ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Final Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed. TCR-MD 19 B.*

*This document was filed and entered on October 20, 2015.*