IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

DOUGLAS COUNTY ASSESSOR,                 )
                                         )
            Plaintiff,                   )    TC-MD 120430N
                                         )
      v.                                 )
                                         )
VANNUCCI BANDON PROPERTIES LLC,          )
                                         )
            Defendant.                   )    **DECISION**

Plaintiff appeals the real market value of property identified as Account R126921

(subject property) for the 2011-12 tax year.  A telephone trial was held on April 9, 2013.  Paul E.

Meyer, Douglas County Counsel, appeared on behalf of Plaintiff.  Brian Lif (Lif), Registered

Appraiser III, testified on behalf of Plaintiff.  Roger A. Hartman (Hartman), power of attorney,

appeared and testified on behalf of Defendant.  Melony Hakola (Hakola), CCIM, Commercial

Broker, and Steve Gerlt (Gerlt), Oregon Registered Appraiser, testified on behalf of Defendant.

Plaintiff's Exhibit A was received over Defendant's objection.[1]  Defendant's Exhibits A through

C were received without objection.

## I.  STATEMENT OF FACTS

The subject property is a 5,379-square foot commercial building situated on 0.66 acres in

Douglas County.[2]  (Ptf's Ex A at 4.)  It is located in the "C3 General Commercial" zone.  (*Id.*)

---

[1] On April 1, 2013, Defendant filed a Motion to Exclude Plaintiff's Exhibit "A" (Motion) under Tax Court Rule-Magistrate Division (TCR-MD) 10 B(1).  TCR-MD 10 B(1) states that "Plaintiff's exhibits shall be marked numerically and have the case number on the label."  Defendant moved to exclude Plaintiff's Exhibit A because it was labeled alphabetically rather than numerically and because Lif erroneously referred to "Defendant" as "Plaintiff" in his appraisal report.  TCR-MD 10 D states that "[a] magistrate may exclude any evidence received after the time of exchange, sanction any party who withholds information, or use any other measure the magistrate considers appropriate."  After considering the matter, the court denied Defendant's Motion. Although Plaintiff failed to comply with the labeling requirement under TCR-MD 10 B(1), exclusion of Plaintiff's Exhibit A as a result is not an appropriate sanction under TCR-MD 10 D in this instance.

[2] Lif testified that the subject property is 5,379 square feet; the figure stated on page four of his report is a typographical error.  (*See* Ptf's Ex A at 4.)

The subject property land was acquired by Defendant for $200,000 in May 2005. (*Id.*) The subject property improvement was constructed in 2006 at a reported cost of $950,000, or $176 per square foot. (*Id.*) Lif testified that the subject property is a "high end medical office." (*See id.* at 5-8 (photographs).) Gerlt testified that the subject property was designed to be half medical office and half professional office. Lif testified that he has been inside the subject property and observed that it was "very well built out." He testified, however, that he could not say whether part of the subject property was "general office" rather than "medical office" based on his inspection. Gerlt testified that the medical office is used by the wife of the subject property owner, Vannucci. (*See* Def's Ex C at 1.) He testified that the subject property general office space has never been leased. Gerlt testified that the subject property was intended to be part of a subdivision of professional offices, but no others were built.

Plaintiff analyzed the 2011-12 real market value of the subject property using each of the three approaches of value: the cost approach, the income approach, and the sales comparison approach. (*See* Ptf's Ex A at 10-15.) Defendant relied upon the sales comparison approach and income approach, having determined that the cost approach was not relevant for an assessment as of January 1, 2011. (*See* Def's Ex A at 20.) The parties' value evidence is discussed in detail in the analysis section below.

The 2011-12 tax roll real market value of the subject property was $1,289,379. (Ptf's Ex A at 4.) The board of property tax appeals (BOPTA) reduced the 2011-12 real market value to $792,375. (*Id.*) The 2011-12 maximum assessed value is $962,525. (*Id.*) Plaintiff requests that the 2011-12 real market value of the subject property be increased to $1,075,500. (*Id.* at 15.) Defendant requests that the 2011-12 real market value determined by BOPTA be sustained.

/ / /

## II. ANALYSIS

The issue before the court is the real market value of the subject property for the 2011-12 tax year. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor* (*Richardson*), TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003) (citing *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1), which states:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."[3]

The assessment date for the 2011-12 tax year was January 1, 2011. ORS 308.007; ORS 308.210.

"Real market value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue." ORS 308.205(2). There are three approaches of valuation that must be considered, although all three approaches may not be applicable: the cost approach, the sales comparison approach, and the income approach. OAR 150-308.205-(A)(2)(a); *Allen v. Dept of Rev.* (*Allen*), 17 OTR 248, 252 (2003). The real market value of property is ultimately a question of fact. *Chart Development Corp. v. Dept. of Rev.*, 16 OTR 9, 11 (2001) (citation omitted).

Plaintiff has the burden of proof and must establish its case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). If the evidence is inconclusive or unpersuasive, Plaintiff will have failed to meet its burden of proof. *See Reed v. Dept. of Rev.,* 310 Or 260, 265, 798 P2d 235 (1990). "[T]he court has

---

[3] All references to the Oregon Revised Statutes (ORS) and to the Oregon Administrative Rules (OAR) are to 2009.

jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

A.      *Cost approach*

"The cost approach is 'particularly useful in valuing new or nearly new improvements.' " *Magno v. Dept. of Rev.*, 19 OTR 51, 55 (2006) (citations omitted). " 'In the cost approach, the value of a property is derived by adding the estimated value of the land to the current cost of constructing a reproduction or replacement for the improvements and then subtracting the amount of depreciation * * * in the structure from all causes.' " *Id.* (citations omitted).

Using "Marshall & Swift valuation," Lif determined a real market value of $1,089,500 as of January 1, 2011, under the cost approach. (*Id.* at 10.) He noted that the reported actual cost of the subject property was $950,000 for the improvements and $200,000 to acquire the land, for a total of $1,150,000. (*Id.* at 4, 10.) Defendant did not offer evidence under the cost approach because the subject property was not "new or nearly new" as of January 1, 2011. (Def's Ex A at 20.) No evidence was offered to rebut Lif's conclusion under the cost approach. However, the subject property improvements were constructed in 2006 and were not "new or nearly new" as of January 1, 2011. For that reason, the court finds that little weight should be placed on the cost approach in this case.

B.      *Sales comparison approach*

The sales comparison approach "may be used to value improved properties, vacant land, or land being considered as though vacant." *Chambers Management Corp v. Lane County Assessor,* TC-MD No 060354D, WL 1068455 at *3 (Apr 3, 2007) (citations omitted). The "court looks for arm's length sale transactions of property similar in size, quality, age and location" to the subject property. *Richardson v. Clackamas County Assessor,* TC-MD No

020869D, WL 21263620 *3 (Mar 26, 2003).  OAR 150-308.205-(A)(2)(c) states:

> "In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions.  When non-typical market conditions of sale are involved in a transaction (duress, death, foreclosures, interrelated corporations or persons, etc.) the transaction will not be used in the sales comparison approach unless market-based adjustments can be made for the non typical market condition."

1.    *Plaintiff's sales comparison approach*

Lif relied in part on the subject property listing price and a rejected offer to purchase the subject property.  (*See* Ptf's Ex A at 11.)  Lif stated in his report that the "[s]ubject property has been listed for $1,199,000 over the last year indicating a listing price of $223 per square foot including land.  Property owner refused a $1,000,000+ offer and according to Sperry Van Ness included no concessions." (*Id.*)  Gerlt testified that the subject property owner received an offer of $1,020,000 that he rejected because he would have had to remodel the professional office at a cost of $200,000 and lease back the subject property for a period of five years at $18 per square foot, or $1.50 per square foot per month.  (*See* Def's Ex C.)  Hartman testified that the net sale price would have been about $557,000.  (*See id.* at 2.)

Lif also relied upon three sales of medical offices between May 2009 and April 2012. (Ptf's Ex A at 11.)  Lif described his sale 1 as a 3,448-square foot "Medical Dental Office" built in 1980 that sold in February 2011 for $224 per square foot.  (*Id.*)  Lif's sale 2 was a 2,104-square foot "Medical Office" built in 1986 that sold in May 2009 for $250 per square foot.  (*Id.*)  Lif's sale 3 was a 3,170-square foot "Medical Office" built in 2005 that sold in April 2012 for $181 per square foot.  (*Id.*)  Lif testified that sale 3 is most similar to the subject property and was also used by Defendant.  Lif testified that he did not make adjustments for location because all three sales were located in close proximity to the subject property.  (*See id* at 13 (map).)  He

testified that he did not make time adjustments because he could not determine market-based time adjustments. The parties agreed that the market was in decline in 2011 and flat in 2012. Lif concluded $200 per square foot for the subject property, or $1,075,800. (*Id.* at 11.)

On cross examination, Lif testified that his sale 2 is located in a medical campus or park and that all three of his sales are located near other medical or dental offices. He testified that the subject property is "free standing," although it is located near other medical offices. Lif testified that he did not consider any adjustment necessary for the fact that his comparable sales were located in medical parks. Hartman noted that, according to the "Sale 1 Verification" provided by Defendant, Lif's sale 1 was not listed with a realtor; was a sale between two business associates; was leased at the time of sale; and required no down payment. (Ptf's Ex A at 24-25.) Lif testified that he did not make adjustments for any of those conditions of sale 1. The "Sale 1 Verification" further states that the buyer did not think the price paid represented the fair market value of the property: "I think the price is to[o] high. We paid a premium so we did not have to move our dental business." (*Id.*) The "Sale 2 Verification" states that it was a "1031 exchange." (*Id.* at 26-27.)

Gerlt relied on two sales, the first of which he described as a "professional office" that sold for $99.58 per square foot in April 2012.[4] (*See* Def's Exs C, A at 20.) Gerlt's second sale is the same sale used by Lif as his third comparable sale: a "medical office" that sold for $181.39 per square foot in June 2012. (Def's Exs C, A at 20.) Gerlt did not make any adjustments to those sales. (*See* Def's Ex C at 1.) Plaintiff questioned whether Gerlt's sale 1 was a "bank sale."

/ / /

---

[4] Hartman testified and presented an analysis of the same sales discussed by Gerlt. (*See* Def's Ex A at 20.) Hartman made a downward time adjustments of 10 percent to each sale and made a downward location adjustment of 15 percent to the second sale. (*Id.*)

Hartman testified that the property had previously been owned by a bank, but it was not "repossessed" by the bank; rather, it was used for computer storage.

Gerlt used the first sale to determine the value of the "professional office" portion of the subject property and used the second sale to determine the value of the "medical office" portion of the subject property. (Def's Ex A at 20; Ex C at 1.) Under the sales comparison approach, Gerlt concluded a value of $755,668. (Def's Ex C at 1.) As additional evidence, Hartman testified that the "old cancer center," a 8,960-square foot building that was remodeled, was on the market listed at $925,000, or $103.24 per square foot, for 639 days from July 2009 through April 2011 with no offers. (Def's Ex A at 15.)

In a letter dated March 25, 2013, Hakola discussed sales in the subject property's market:

"Within the last 24 months only two medical properties have sold in the Multiple Listing Service. A former Chiropractic Clinic located at 2270 NW Troost Street sold for $575,000 based on a price per S/F of $181.39. It was on the market for 273 days with an original list price of $835,000. The second medical office space at 544 West Umpqua Street sold for $112,500 based on a price per S/F of $41.67. It was on the market with an original list price of $199,000."

(Def's Ex B at 2, *see also* 3-7.) Hakola presented evidence of three sales of office buildings in 2010 and 2011, with prices per square foot ranging from $27.93 to $85.71. (*Id.* at 8-13.) She testified that she showed the subject property in March 2013 and received an offer of $700,000, which is low, but the highest offer received yet. (*See id.* at 2.)

The court finds the evidence presented under the sales comparison approach indicates that the real market value of the subject property as of January 1, 2011, was in the range of $700,000 to $973,600. Lif's first sale was not an arm's-length transaction; it was a sale between "business associates." Moreover, the buyers of sale 1 stated that they paid "a premium" to avoid moving their dental business. Lif did not make any adjustments for the sale 1 conditions. Lif's sale 1 is, at best, a high indicator of the subject property's real market value as of January 1,

2011. Lif's second sale, a 1031 exchange, occurred more than one and one half years before the assessment date, yet Lif made no adjustment for changes in market conditions during that time. The parties both considered Lif's sale 3 to be comparable to the subject property and the court finds that it provides the best sale presented under the sales comparison approach. Lif's sale 3 indicates a value of $181 per square foot, or $973,599, as of January 1, 2011. Evidence presented of efforts to market and sell the subject property suggests that its real market value was lower as of January 1, 2011, perhaps as low as $700,000.

> The Oregon Supreme Court stated in *Truitt Brothers, Inc. v. Dept. of Rev.* (*Truitt Bros*):
>
> "Usually, one sale does not make a market. The basic assumption of the sales comparison approach is that there is sufficient data and information available to provide a pattern or range of indicated value. The sales comparison approach is intended to reflect the 'market' and not just one or two buyers."

302 Or 603, 609, 732 P2d 497 (1987). "When the market contains an insufficient number of transactions to create value patterns, the application of the [comparable sales] approach may be limited or inappropriate." *Id.* at 610 (citations omitted). Due to the very limited number of comparable sales, the court is not persuaded that the information presented is sufficient to provide a reliable indicated value under the sales comparison approach. As a result, the court gives little weight to the sales comparison approach.

C.      *Income approach*

"The income method of valuation relies on the assumption that a willing investor will purchase a property for an amount that reflects the future income stream it produces." *Allen*, 17 OTR at 253 (citations omitted). "The direct capitalization method * * * focuses on two key components: (1) the capitalization rate * * * and (2) net operating income." *Id.* at 253. "[Net operating income] is the currently expected net income of a property after all operating expenses are deducted from gross income." *Id.* at 254 (citations omitted).

In his income approach, Lif relied in part on the subject property lease listing rate of $1.50 per square foot per month. (Ptf's Ex A at 14.) He stated that "[a] portion of the subject medical office is advertised for lease at $1.50/sq ft NNN. This lease rate is typical in the area for this caliber of medical office property." (*Id.*) Lif testified that he reviewed eight comparable leases with rates ranging from $1.31 to $2.71 per square foot and a mean of $1.57 per square foot, although he did not provide those with his evidence. Lif used a seven percent vacancy rate and "an expense ratio of 10% was used since this is based upon a triple net lease where the tenant pays all the expenses." (*Id.*) Lif used a capitalization rate of 7.5 percent, which he stated "is considered typical and can be supported by Sale #1 indicating a cap rate of approximately 6%." (*Id.*) Lif testified that the vacancy rate and expense ratio were both typical for the market, although he did not provide any evidence supporting those rates. He concluded a value of $1,080,500 under the income approach. (*Id.*)

Defendant questioned Lif regarding why he used seven percent vacancy given that the subject property has been 50 percent vacant since 2006. Lif testified that he does not think 50 percent vacancy is the market rate and he thinks that the subject property owner could have offered to lease the subject property at less than $1.50 to get a tenant. Hakola testified that she thinks the market vacancy rate was about 30 percent based on listings.

Hartman testified that a property built in 2010 and located about one half block from the subject property has been listed for lease at $0.75 per square foot per month with no takers. (*See also* Def's Ex A at 13-14 (photographs of the property).) He testified that another property, described in the listing as "medical/commercial suites," was listed in 2011 for $0.75 per square foot and had received no offers. (Def's Ex A at 18-19.) Hartman testified, based on his conversations with realtors, an eight percent capitalization is supported. (*Id.* at 20.)

In her March 25, 2013, letter, Hakola provided her opinion that the real market value of the subject property under the income approach is $720,000. (Def's Ex B at 1.) Hakola stated that she has "had the [subject property] lease listing [at $1.50 per square foot] since September 2011 with still no tenant." (*Id.*) She explained her opinion of value as:

> "[t]he average medical price per S/F on the Mercy Medical Campus is $1.00 per S/F. [The subject property] is half office and half medical space. * * * [At] 60 cents per S/F for the office portion of the building, the monthly income would be $4,800.00 and NOI (Net Operating Income) of $57,600.00. Based on an 8% cap for our area, that brings the value by an Income Approach to $720,000.00."

(*Id.*) Hakola testified that the subject property is a beautiful building, but the location is not good because it is not on Garden Valley Boulevard and is not visible from the boulevard. (*See id.*) She testified that she has marketed the subject property aggressively and offered free rent.

Hakola provided a "rent study" of office space that she prepared for another client, describing four "recorded leases" with starting dates in 2012 and 2013. (Def's Ex B at 14.) She testified that typical office space lease rates were between $0.40 and $0.75 per square foot per month. The four leases included in her rent study were: a 2945-square foot "dental office" leased "net" for one year at $3,200 per month; a 2,700-square foot office leased "net" at $1,500 per month; a 2,000-square foot office leased "net" for one year at $1,100 per month; and a 4,400-square foot office leased "full service" at $1.00 per square foot for five years with "$18.00 per annual S/F allowance for T.I." (*Id.*) On a per month basis, those lease rates range from $0.55 to $1.09 per square foot. (*See id.*) Hakola testified that she listed another medical office located at 2550 NW Medical Drive for over two years; it was initially listed at $1.50 per square foot, reduced to $1.25, and reduced again to $1.00 as of the date of trial. She testified that it has 26 dedicated parking spaces, which is very desirable.

/ / /

Plaintiff questioned Hakola about two leases that Lif reviewed at $1.57 per square foot and $2.17 per square foot. She testified that the "Hollywood video building" is leased at $2.17 per square foot to the American Red Cross and Aspen Dental. She testified that it cost $410,000 to split that building into two office spaces, including splitting the "HVAC" and adding a new roof. Hakola testified that the building has the best location at a busy intersection on Garden Valley Boulevard. She testified that a space near the Albertson's grocery store is leased to Battery Plus for $1.50 per square foot, but that lease is "all-inclusive," not triple net.

The court finds that Lif's market rent of $1.50 per square foot is unpersuasive. Hakola testified persuasively that the subject property office space was vacant and listed at $1.50 per square foot since at least September 2011, and that she has marketed the subject property aggressively. Moreover, there is no other evidence supporting market rent of $1.50 per square foot. Lif testified that he reviewed other leases, but he did not provide any information about those leases in his evidence. Hakola testified that she considered the market lease rate to be $1.00 per square foot for the subject property medical office and $0.60 per square foot for the subject property office. She presented several office leases to support her conclusion. Hakola's comparable leases are from leases started in 2012 and 2013, one to two years after the assessment date of January 1, 2011. Nevertheless, Hakola's evidence of market rents was the most persuasive evidence presented to the court in this matter and the court agrees with Hakola's market rent conclusions of $1.00 per square foot for the subject property medical office and $0.60 per square foot for the subject property office.

The court received no evidence of vacancy rates, expense rates, or capitalization rates. Lif and Hakola each testified as to their opinions, but neither provided any supporting market evidence. It is unclear to the court how Lif selected his vacancy rate of seven percent.

Defendant's representatives suggested that the vacancy rate should be 50 percent based on the subject property's actual vacancy rate. The court is not persuaded that the market vacancy rate was 50 percent as of January 1, 2011, particularly given Defendant's apparent refusal to reduce the subject property lease listing price from $1.50 per square foot. Hakola, evidently, did not include a vacancy rate or expense rate in her income approach; she effectively used a rate of zero for both vacancy and expenses. Lif used a capitalization rate of 7.5 percent and Hakola used 8 percent. Neither presented any evidence supporting their selected capitalization rates.[5]

The lack of evidence on market vacancy and expense rates renders the income approach incomplete. To the extent that the court can determine an indicated value under the income approach, that value is in the range of $720,000 to $768,000. Hakola concluded a value of $720,000 under the income approach using a capitalization rate of eight percent and with no vacancy or expense rate. Lif selected a capitalization rate of 7.5 percent, which indicates a value of $768,000 with no vacancy or expense rate. The evidence presented, although incomplete, suggests that the indicated value of the subject property under the income approach was no more than $768,000 as of January 1, 2011. Because the evidence presented under the income approach was incomplete, the court cannot place much weight on the income approach.

D.    *Reconciliation and burden of proof*

Much of the evidence presented by the parties was inconclusive or unpersuasive. The parties relied primarily on the sales comparison and income approaches. The evidence presented supports a finding that very few sales of comparable properties occurred close to the January 1, 2011, assessment date. The parties both agreed that a property that sold for $181 per square foot

---

[5] Lif stated in his report that his sale 1 indicated a capitalization rate of six percent. As discussed above, the court found that Lif's sale one was not an arm's-length transaction; it was a sale between business associates and the buyers reported that they "paid a premium" to avoid moving their dental business. Lif's sale 1 is not persuasive.

in April 2012 was comparable to the subject property. That sale, without any adjustments, suggests a real market value of $973,599. However, as stated in *Truitt Bros*, one sale does not usually make a market. *Truitt Bros*, 302 Or at 609. The evidence submitted by the parties under the income approach indicated that the real market value of the subject property as of January 1, 2011, was no more than $768,000. However, the evidence presented under the income approach was incomplete and the court cannot place much weight on the income approach.

### III. CONCLUSION

Plaintiff has the burden of proof in this matter and must establish its case by a preponderance of the evidence. Plaintiff has failed to prove by a preponderance of the evidence that the real market value of the subject property was $1,075,500 as of January 1, 2011. BOPTA reduced the 2011-12 real market value of the subject property to $792,375. That value is in the range supported by the evidence presented in this matter. The court concludes the 2011-12 real market value determined by BOPTA is reasonable and there is insufficient evidence supporting a change in that value. Plaintiff's appeal must be denied. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied.

Dated this ____ day of June 2013.

ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within <u>60</u> days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Magistrate Allison R. Boomer on June 19, 2013. The Court filed and entered this document on June 19, 2013.*