IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

KOHL'S DEPARTMENT STORES,                )
                                         )
            Plaintiff,                   )      TC-MD 130220D
                                         )
        v.                               )
                                         )
WASHINGTON COUNTY ASSESSOR,              )
                                         )
                                         )
            Defendant.                   )      **FINAL DECISION**

The court entered its Decision in the above-entitled matter on December 9, 2014.

Plaintiff filed timely filed a statement for costs and disbursements on December 22, 2014.

Defendant filed its Objection to Statement of Costs on January 2, 2015.  Plaintiff filed its "leave

of the Court to file" Response to Defendant's Objections to State of Costs on January 7, 2015.

This matter is now ready for the court's Final Decision.

The court's Final Decision incorporates its Decision without change and includes the

court's analysis and determination of Plaintiff's/Defendant's statement for costs and

disbursements in section III.

Plaintiff appeals the real market value of property identified as Account R66421 (subject

property) for the 2012-13 and 2013-14 tax years.[1]  A trial was held in the courtroom of the

Oregon Tax Court, Salem, Oregon, from July 22 to July 23, 2014.  Jack L. Orchard, Attorney at

Law, appeared on behalf of Plaintiff.  Grant Norling, MAI appraiser, (Norling) and David Lees,

Kohl's Senior Manager of Real Estate Expense (Lees), testified on behalf of Plaintiff.  Brad

Anderson, Senior Assistant County Counsel, appeared on behalf of Defendant.  Kimmerle

---

[1] The facts and analysis in this Decision apply to both the 2012-13 and 2013-14 tax years.  The only tax year at issue in this case is 2012-13, the 2013-14 tax year is addressed in *Kohl's Homeport Associates LLC v. Washington County Assessor*, TC-MD 140171D.

Culver, Senior Property Appraiser (Culver), and Dylan Ross, appraiser, (Ross) testified on behalf of Defendant. Plaintiff's Exhibit 1 and Defendant's Exhibit A were admitted without objection.

Following trial both parties were allowed to submit corrections for typographical and mathematical errors stated in their appraisal reports. Culver submitted replacement pages for her appraisal report and Norling submitted a new appraisal. Defendant filed objections to Plaintiff's new appraisal on August 19, 2014. Culver's replacement pages are within the court's ruling and are admitted. Norling's new appraisal report included both corrections and changes to his original appraisal report based on information that was developed during trial. Norling's new appraisal report is beyond the scope of typographical and mathematical changes. The portion of Norling's new appraisal report, consisting of his computed loaded capitalization rate and the subsequent mathematical changes is admitted, and all other pages of his new appraisal report are excluded.

## I. STATEMENT OF FACTS

Norling and Culver testified that they inspected and appraised the subject property. The parties agreed to the following facts:

(1) The subject property is currently operated as a Kohl's department store, a single-tenant, big box retail store located on a 6.04-acre site at 11055 SW Canyon Road in Beaverton, Oregon. (Ptf's Ex 1 at 20; Def's Ex A at 35.)

(2) The subject property's highest-and-best use as vacant is to develop as a commercial/retail site. Its highest-and-best use improved is as a big box store. (Ptf's Ex 1 at 28; Def's Ex A at 60-61.)

(3) The subject property is located in a mixed use neighborhood with single-family homes to the north, a retail strip center and gas station to the south, a car dealership to the east, and the Beaverton Tigard Highway to the west of the subject property. (Ptf's Ex 1 at 15; Def's Ex A at 35.)

(4) The subject property was built in 1989 and remodeled in 2006 and 2011. (Def's Ex A at 35.)

(5) The subject property's net rentable area is 103,909 square feet. (Def's Ex A at 35; Ptf's Ltr at 1, July 24, 2014.)

A.    *Plaintiff's Evidence*

Norling reviewed his appraisal report. Norling's appraisal report stated that he considered, but did not develop, all three valuation approaches (cost, sales comparison, and income). (Ptf's Ex 1 at 29.) Norling testified that he did not rely on the cost approach because it "has limited applicability due to the age of the [subject property's] improvements and lack of market based data to support an estimate of accrued depreciation." (*Id.*) Norling testified that he relied on the income approach and the sales comparison approach to determine the subject property's 2012-13 and 2013-14 real market value of $8,770,000. (*Id.* at 46.)

1.    *Income Approach*

Norling testified that, for his income approach, he selected six rent comparables located between 0.7 and 9.4 miles of the subject property. (*See id.* at 32.) Norling's testimony described the primary elements of comparison, stating that the subject property's "location and condition/age are good, quality is average, exposure is average to good" and "access and parking ratio are substandard." Norling testified that he adjusted the market rent rates, using two separate adjustment categories called "transactional adjustments" and "property adjustments." (*Id.* at 34.)

In his appraisal report, Norling's first adjustments were labeled "transactional adjustments" and the adjustments made were solely for "concessions." (*Id.*) Norling testified that his concessions adjustment is "a basis for creating a comparable market standard [of] free rent [for] 3 months and a tenant improvement allowance of $0/SF." (*Id.* at 31.) On cross-examination, Norling testified that the concessions adjustment was based on "direct confirmation with leasing brokers." Norling explained that the differences between free rent and tenant

improvements were then "divided by the comparable's lease term, and applied to the beginning base rent of the comparable lease." (*Id.*) Norling testified that the range of concessions adjustments was from a downward adjustment of $4.15 per square foot to an upward adjustment of $0.39 per square foot. (*Id.* at 34.)

Norling testified that his second adjustments included location, space size, quality, condition, year built, exposure, access, and parking ratio, and were "qualitative." (*Id.*) Norling testified that he "used smaller size buildings, 40,000 to 55,000 square feet," because there were no "recent lease comps within the Portland MSA that transacted within a reasonable timeframe of the effective valuation date that are reflective of the subject's size." (*Id.* at 35.) In his appraisal report, Norling stated that he "applied a downward adjustment of [five percent]to all of the comparables" for space size and and an additional five percent downward adjustment for access. (*Id.*) On cross-examination, Culver questioned why the "same five percent adjustment was applied" for the parking ratio "whether the parking ratio was 8.6 or 1.6." (*See id.* at 34.) Norling's total property adjustments ranged from a negative 20 percent adjustment to a positive five percent adjustment. (*Id.*)

Norling testified that his unadjusted market rent rates ranged from $7.75 per square foot to $15.00 per square foot. (*See* Ptf's Ex 1 at 36.) Norling testified that he gave lease comparables 4 and 6 "primary consideration" as they "required the lowest level of total adjustment."[2] (*Id.*) Norling's appraisal report stated that lease comparables 4 and 6 are respectively located 2.8 miles and 9.4 miles from the subject property and are superior to the subject property in terms of access and parking ratio. (*Id.* at 32, 34.) He testified that the subject property has a parking ratio of 2.5 spaces per 1,000 square feet while market standards require 3

_____

[2] Norling labeled comparable lease 4 as 4-A on page 34 of his appraisal report but otherwise referred to the comparable as 4. (*See* Ptf's Ex 1 at 32-36.) The court refers to the lease comparable as 4.

to 5 spaces per 1,000 square feet. (*Id*. at 35.) Norling testified that the adjusted rent rates ranged from $8.29 per square foot to $8.68 per square foot and he concluded the subject property's market rent rate to be $8.50 per square foot as of the assessment date. (*Id*. at 36.) Using his determined market rent rate, Norling testified that he concluded an annual potential gross rent of $884,400. (*Id.*) Norling subsequently adjusted the annual potential gross rent to $883,915 based on the parties' agreed net rental area of 103,909 square feet. (Ptf's Ltr at 1, July 24, 2014.)

Norling testified that because the market rent rate is based on a "triple net lease," the operating expenses, including property taxes, insurance, maintenance, management fees and reserves, are "passed through" to the tenant. Norling concluded that the operating expenses were matched with reimbursements. (*See* Ptf's Ex 1 at 39.) Norling testified that his only reduction to the annual potential gross rent was a "10 percent vacancy and credit loss," resulting in a 10 percent reduction. (*Id*.) Norling testified that he determined a net operating income of $772,043. (*Id*.) Norling subsequently adjusted the net operating income to $771,620. (Ptf's Rev Ex 1 at 35.)

In his appraisal report, Norling concluded an 8.87 percent capitalization rate based on a review of regional and national capitalization rate comparables. (Ptf's Rev Ex 1 at 34.) He stated that regional capitalization rate comparables indicated a range from 6.77 percent to 9.87 percent and an average of 8.19 percent, with the subject property being "most comparable with the sales of the upper end" of comparable sales 5 through 8. (Ptf's Ex 1 at 37.) The national capitalization rate comparables selected by Norling ranged from 6.78 percent to 8.87 percent with an average of 7.56 percent. (*Id.* at 38.) In his appraisal report, Norling concluded that the subject property was most comparable with the sales "at the upper end of this range" of

/ / /

comparables. (*Id.*) Norling stated that he "considered the PricewaterhouseCoopers * * * national net leased data for 4Q 2011 and 4Q 2012" in his capitalization rate conclusion. (*Id*.)

In his appraisal report, Norling concluded that "a middle-upper range conclusion of 8.75 %" was supported for the subject property. (*Id.*) Norling testified that he adjusted the capitalization rate upward by 0.12 percent for the "load for real estate taxes" resulting in a "final cap rate conclusion" of 8.92 percent. (*Id.*) On cross-examination, Defendant challenged Norling, stating that none of Norling's "sales" were "local" and Norling relied on "regional sale data." Norling concluded a real market value of $8,660,000 (rounded). (*Id.* at 39.) In response to Defendant's questions, Norling stated that the correct capitalization rate should be 8.87 percent. In his appraisal report submitted after trial, Norling concluded a real market value of $8,700,000 (rounded) for both tax years. (Ptf's Rev Ex 1 at 35.) Defendant accused Norling of "double counting" his conclusion that the subject property "was a below average property" in the capitalization rate. Norling rebutted, stating that the "capitalization rate is influenced by the subject's actual position."

2.      *Sales Comparison Approach*

In his appraisal report, Norling discussed his sales comparison approach. (Ptf's Ex 1 at 40.) Norling testified that it was "challenging to collect comparables to the subject property" because properties similar to the subject property "do not trade hands on a fee simple basis." Norling stated that he selected four properties comparable to the subject property. Three properties were located within 12.3 miles of the subject property and the fourth was located in Kirkland, Washington, a distance of 155.7 miles from the subject property. (*Id.* at 41.) Norling stated that the net rentable area of those four properties ranged from 66,085 square feet to 200,000 square feet, with reported unadjusted sale prices per square foot ranging from $77 to

$112. (*Id.* at 43-44.)  In his appraisal report, Norling stated that he considered transactional adjustments (property rights, conditions of sale, financing, and market conditions) but concluded that none was necessary.  (*See id.* at 43.)  Norling testified that he made adjustments to the sale prices for location, size, quality, condition and age, exposure, access, and parking ratio and site coverage.  (*Id.* at 43-44.)  Norling testified that the sum of his adjustments ranged from a downward 15 percent adjustment to an upward 10 percent adjustment.  (*Id.*)  Norling stated that the "level of total adjustment applied to the comparables is considered to range from minimal to moderate and warranted to bring their locational and physical characteristics in alignment to those of the subject."  (*Id.* at 44.)  Norling stated that the adjusted comparable properties ranged from $82 to $95 per square foot.  (*Id.* at 45.)  In his appraisal report, Norling concluded a price per square foot of $85.  (*Id.*)  Norling determined a real market value under the sales comparison approach of $8,840,000 for both tax years.  (*Id.*)

In reaching this conclusion, Norling testified that comparable sale 3, the sale of a larger "building to Costco" with a real market value of $85 per square foot, was given primary consideration due to its location in the market area, as well as its similar quality, condition, and access.  When questioned, Norling testified that if comparable sale 3 were a land-only sale, it would not be a comparable sale for the subject property.  Norling subsequently "removed Hillsboro Costco sale (previously comp 3) from the Sales Comparison Approach[.]"  (Ptf's Ltr at 1, July 24, 2014.)  Norling's appraisal report stated that comparable sale 1 "fell out of escrow," and in response to questions Norling stated that the "failed sale" was "completed a couple years later." (Ptf's Ex 1 at 43.)  Norling admitted during cross-examination that the Kirkland, Washington property was given "minimal emphasis."

/ / /

B.      *Defendant's Evidence*

Culver testified that she developed all three approaches of value to determine the subject property's real market value.  Culver's appraisal report stated that she relied on the income, sales comparison, and cost approaches to determine the subject property's 2012-13 real market value of $15,100,120 and 2013-14 real market value of $15,567,350.  (Def's Ex A at 8.)  Culver stated that she "gave the Cost Approach the least weight[,] * * * secondary consideration to the Sales Comparison Approach[,] and [gave]the most weight to the Income Capitalization Approach." (*Id*.)

1.      *Cost Approach*

Culver testified that in determining the subject property's real market value she gave "2.5 percent weight" to the cost approach.  Culver testified that she determined the subject property's land real market value using the sales of six comparable properties, and that "[a]ll of the sales were located within the tri-county area." (*Id*. at 63.)  In her appraisal report, Culver stated that two of the six sales were "raw land," three of the six sales were "previously developed lot[s]" and one sale was a "partially developed lot." (*Id*. at 65-67.)  Culver stated that "[n]one were directly comparable to the subject site and all required varying upward and downward adjustments." (*Id*. at 68.)  In her appraisal report, Culver stated that the parcel size ranged from 100,310 square feet to 801,504 square feet. (*Id.* at 65-67.)  Culver testified that she could not make "quantitative adjustments."  Culver reported unadjusted sale prices per square foot ranging from $17.94 to $22.69 and adjusted sale prices per square foot ranging from $16.72 to $22.35 for 2012-13 and $16.72 to $22.13 for 2013-14. (*Id*. at 69-70.)  Based on those adjusted sale prices, Culver determined weighted average prices per square foot of $19.94 and $20.05 for 2012-13 and 2013-14, respectively. (*Id*.)  Culver determined the subject property's land real market value

as of January 1, 2012, to be $5,246,300 (rounded) and as of January 1, 2013, to be $5,275,200 (rounded).  (*Id.* at 68.)

Culver testified that she used "the Marshall Valuation Service computerized Commercial Cost Estimator in conjunction with Marshall's Valuation Services publication" to determine the subject property's improvement real market value.  (*Id.* at 71.)  Culver concluded that the value of the subject property improvements as of January 1, 2012, was $10,435,420 and as of January 1, 2013, was $10,321,880.  (*Id.* at 72.)

Culver testified that the cost approach indicated that the subject property's real market value as of January 1, 2012, to be $15,681,720 and as of January 1, 2013, to be $15,597,080. (*Id.*)

2.      *Income Approach*

In explaining her income approach, Culver testified that "whether a big box retail store qualifies for an absolute net lease is dependent upon their credit status – the higher the credit rating, the lower the lease rate * * * high credit rated tenants will often be able to negotiate better lease terms, including absolute net leases vs. typical NNN [triple net] leases."  (*Id.* at 94.) Referencing the foregoing statements, Culver testified that she developed an income approach for both an "absolute net lease" and a "typical triple net lease."

In developing her income approach, Culver testified that she selected 10 rent rate comparables, from 2009 through 2012.[3]   (*Id*. at 88-92.)   Culver testified that her rent rate comparables ranged from $10 per square foot to $16.77 per square foot with an average of $12.65 per square foot.  (*Id.* at 88-93.)  Culver testified that she selected rent rate comparables

/ / /

_____

[3] All of Culver's comparables were "NNN leases" except her comparable 10 which was an "absolute net lease."  (*See* Def's Ex A at 94.)

that bracketed the subject property's underlying lease rate, $10.74 per square foot, and the sublease rate, $14 per square foot. (*See id.* at 94.)

Culver was questioned about the relevance of the subject property's sublease between Home Depot and Plaintiff, noting that the sublease "ends in seven to 10 years." Culver testified that she made qualitative adjustments to her rent comparables for categories of "Land Characteristics," "Building Characteristics," and "Functionality." (*Id.* at 95-96.) She testified that after making these adjustments she assigned each comparable an overall qualitative adjustment. (*Id.*) Culver testified that based on the overall adjustment to each "comparable improved rental" she weighted each comparable sale. (*Id.*) She testified that comparable 10, the Burlington Coat Factory, is "an absolute net lease," and the "closest in size" to the subject property but is "inferior in many other respects" such as land size, improvement size, construction quality, age, and condition. (*See id.* at 96.)

In her appraisal report, Culver developed two different values for the subject property's rental rate under a "typical NNN lease," one including comparable 10, concluding $12.13 per square foot, and one excluding comparable 10, concluding $12.15 per square foot. (*Id.* at 95, 97.) In her appraisal report, Culver stated that "[i]nasmuch as the subject property is a big box retail subject to absolute rent leases, I relied on the absolute net lease value conclusions corroborated by the NNN lease value conclusions." (*Id.* at 100.) Culver determined that "an absolute net lease rate of $11.00/SF as of January 1, 2012 and January 1, 2013 is reasonable and well supported." (*Id.* at 94.)

Using her concluded rent rate, Culver determined potential gross income of $1,142,999 for both tax years. (*Id.* at 100.) Using her concluded rent rates excluding comparable 10 (absolute triple net lease), Culver's appraisal report stated that she determined potential gross

income of $1,262,494. (*Id.* at 100.) Culver testified that "[b]ig box stores under absolute net leases are typically single-tenant properties which are either 100% occupied or 100% vacant." (*Id*. at 97.) She testified that she concluded that a zero vacancy rate was appropriate for the subject property. Culver testified that based on her research she "concluded that a NNN vacancy rate of 9.5% as of January 1, 2012 was reasonable and well supported by the market" and "a NNN vacancy rate of 8.5% as of January 1, 2013 was reasonable and well supported by the market." (*Id*.) Culver testified that "tenants are responsible for all property operating and maintenance expenses in an absolute net lease," and "I concluded an expense ratio of 0.0% as of January 1, 2012 and January 1, 2013." (*Id*.) Culver testified that for a triple net lease she "concluded that an expense rate of 5.0% was appropriate as of January 1, 2012 and January 1, 2013." (*Id.* at 98.)

In her appraisal report, Culver determined net operating income for the absolute net lease to be $1,142,999 for January 1, 2012, and January 1, 2013, the same as potential gross income. (*Id*. at 100.) Culver determined net operating income for the triple net lease to be $1,085,430 for January 1, 2012, and $1,097,423 for January 1, 2013. (*Id*.)

Culver testified that she developed two income capitalization models, using "three of the properties analyzed in the Sales Comparison Approach," stating that "[i]n general, OARs [overall capitalization rates] outside the Portland MSA [metropolitan statistical area] are higher than those within." (*Id*. at 98.) Culver testified that for an absolute net lease, an "OAR of 8.3% as of January 1, 2012 and an OAR of 8.0% as of January 1, 2013 was both appropriate and warranted." (*See id.* at 99.) Culver testified that for a triple net lease, an "OAR of 7.75% as of January 1, 2012 and an OAR of 7.5% as of January 1, 2013 was both appropriate and

/ / /

warranted." (*Id.*) Norling testified that Culver "consistently" selected a rate "lower than average."

Using her determined net operating income and capitalization rates, Culver concluded that the subject property's real market value (rounded) using the income approach, was:

|  | January 1, 2012 | January 1, 2013 |
|---|---|---|
| Absolute Net Lease: | $13,771,070 | $14,287,490 |
| Triple Net Lease: | $14,005,540 | $14,632,310 |

(*Id.* at 100.)

In his rebuttal testimony, Norling testified that he believed Culver's lease comparables did not adequately address concessions and owner/tenant improvements. He testified that he verified that "five of the six comparables chosen by Culver were given tenant improvement allowances." Norling further testified that while the stated values of both his and Culver's comparable rent rates are similar, Culver's comparable rent rates do not adequately reflect the effective rental rates because there is no allowance for rent concessions and owner/tenant improvements.

3. *Sales Comparison Approach*

Culver testified that she developed the sales comparison approach, giving "47.5 percent weight" to this approach. Culver selected four comparable sales, stating that comparable property 5 was a resale of comparable property 3. (*Id.* at 80.) She testified that "Sale 1 and Sale 2 were fee simple sales[,]" and "Sale 3, [and] Sale 4 * * * were leased fee sales." (*Id.*) Culver testified that "[a] leasehold interest exists when there is a difference between market lease rates and terms and existing lease rates and terms. When there is no difference, the leased fee interest is equivalent to the fee simple interest. Accordingly, no adjustments were required for property

rights conveyed." (*Id.*) The unadjusted sale prices ranged from $83.23 per square foot to $245.11 per square foot. (See *id.* at 75, 77-79.)

Culver testified "[a]ll but one of the sales is located outside Washington County. Accordingly, I valued the subject land. I then extracted the land value from each improved sale and compared their improvements." (*Id.* at 75.) Culver adjusted each sale price for time, building characteristics and functionality. (*See id.* at 81.) Culver testified that she considered the sales to be "best reflective of real market value for the subject property" and adjusted the sales prices for functionality and improvement characteristics. (*Id.* at 75, 80.) Culver testified that after making adjustments she assigned an overall qualitative adjustment to each sale and derived a weighted average adjusted sale price of $108.00 [rounded] per square foot. (*Id*. at 81.) Culver testified that she determined an "Indicated Improvement RMV Rounded to $11,222,200" for tax year 2012-13 and "$11,637,800" for tax year 2013-14. (*Id*. at 81-82.)

In response to Orchard's questions critiquing Culver's use of the extraction method to determine the subject property's land value, Culver testified that the extraction method is used in cases where there are a limited number of property sales located in the subject property's vicinity and it is necessary to identify comparable sales in locations outside of the subject property's vicinity. Culver testified that in such cases, it is necessary to make allowances for differences in location factors that are attributed to land by extracting the comparable land values from their total real market values.

Norling testified that he has never known the land extraction method to be applied to the valuation of big box properties and questioned how, once the land value is extracted, an appraiser might make adjustments for property deficiencies. Referring to Culver's reliance on the ratio of land real market value to total real market value on the tax roll to extract a land value,

Norling rhetorically asked: "When was the last time the county reappraised or trended real market value?"

C.     *Reconciliation*

In his appraisal report, Norling concluded that the subject property's real market value as of January 1, 2012, and January 1, 2013, was $8,770,000. (Ptf's Ex 1 at 46.) Norling stated that he placed "equal emphasis * * * on the Income and Sales Comparison Approaches." (*Id.*) In her appraisal report, Culver concluded that the subject property's real market value as of January 1, 2012, was $15,100,120 and as of January 1, 2013, was $15,567,350. (Def's Ex A at 8.) Culver testified that her real market value conclusion was based on weighting her three approaches to value: 2.5 percent weight on the cost approach, 47.5 percent weight on the sales comparison approach, and 50 percent weight on the income capitalization approach. (*Id.*)

D.     *Other Factors*

Ross, who relied on his more than 15 years of prior retail ("big box") management experience, testified that various factors impacting the subject property's real market value were considered by Culver. He testified that even though access to the subject property is not "ideal," the subject property is "in a strong location, next to other retail stores," with access to "two major thoroughfares" and "highly visible from the Highway 217." Ross testified that the subject property is close to residential neighborhoods and other retail stores and as a "stand alone big box" the subject property "draws its own traffic."

Lees, who is currently employed by Plaintiff as a senior real estate manager, testified that Plaintiff entered the Oregon market in 2006, opening "four to five stores in a short period of time." Lees testified that the subject property's real market value is negatively impacted by numerous factors. Lees testified that the square footage of the subject property is larger than

"what is typical for Kohl department stores," that access to the property makes "large deliveries difficult," and that parking on the subject property is "very limited." Lees testified that he "could not identify future possible tenants for the subject property." In response to possible use as a home improvement store, Lees testified that even though the size of the property makes it suitable for home improvement stores, the subject property "lacks the outdoor space and adequate access to the property for deliveries that home improvement stores require."

## II. ANALYSIS

The issue before the court is the subject property's real market value as of the assessment dates for the 2012-13 tax year and 2013-14 tax year. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor* (*Richardson*), TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003) (citing *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1),[4] which states:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

The assessment date for the 2012-13 tax year and the 2013-14 tax year was January 1, 2012, and January 1, 2013, respectively. *See* ORS 308.007; ORS 308.210.

"Real market value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue * * *." ORS 308.205(2). There are three approaches of valuation that must be considered, although all three approaches may not be applicable: the cost approach, the sales comparison approach, and the income approach. *Allen v. Dept. of Rev.*, 17 OTR 248, 252 (2003); OAR 150-308.205-(A)(2)(a). The real market value

---

[4] The court's references to the Oregon Revised Statutes (ORS) are to 2011.

of property is ultimately a question of fact. *Chart Development Corp. v. Dept. of Rev.*, 16 OTR 9, 11 (2001).

Plaintiff has the burden of proof and must establish its case by a preponderance of the evidence. *See* ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). If the evidence is inconclusive or unpersuasive, Plaintiff will have failed to meet its burden of proof. *See Reed v. Dept. of Rev.,* 310 Or 260, 265, 798 P2d 235 (1990). "[T]he court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

A.    *Cost Approach*

"The cost approach is particularly useful in estimating the real market value of new construction because cost and market value can be more closely related when properties are new." *Anderson v. Lane County Assessor*, TC-MD No 090298 at 6 (Nov 17, 2009). The parties agree that the subject property was built in 1989 and remodeled in 2006 and 2011. The parties agree that the subject property is not "new" but the remodels have extended its life. Norling did not develop the cost approach, having determined that "the Cost Approach has limited applicability due to the age of the improvements and lack of market based data to support an estimate of accrued depreciation." (Ptf's Ex 1 at 29.) Culver did develop the cost approach but attributed 2.5 percent of her real market value determination to the cost approach. Norling and Culver substantially agree that the cost approach is not a reliable indicator of the subject property's real market value. The court agrees that the cost approach is not applicable to determine the subject property's real market value.

/ / /

B.      *Sales Comparison Approach*

The sales comparison approach "may be used to value improved properties, vacant land, or land being considered as though vacant." *Chambers Management Corp v. Lane County Assessor*, TC-MD No 060354D, WL 1068455 at *3 (Apr 3, 2007) (citations omitted). The "court looks for arm's length sale transactions of property similar in size, quality, age and location" to the subject property. *Richardson*, WL 21263620 at *3.

"In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions. When nontypical market conditions of sale are involved in a transaction (duress, death, foreclosures, interrelated corporations or persons, etc.) the transaction will not be used in the sales comparison approach unless market-based adjustments can be made for the nontypical market condition." OAR 150-308.205-(A)(2)(c).

Norling and Culver both developed the sales comparison approach. Norling presented sales of four comparable properties in his appraisal report. One of Norling's comparable properties (comparable 1) was not a sale; it was a transaction that according to Norling "fell out of escrow." (Ptf's Ex 1 at 43.) Another comparable property (comparable 3) selected by Norling was a land sale that he gave "primary consideration," concluding it was "a good indicator for the subject property." (Ptf's Ex 1 at 44.) Norling subsequently withdrew this property. Only two of Norling's four properties were sold and adjusted to be comparable to the subject property. One of those two sales (comparable 4) was given "minimal" consideration by Norling and the other sale (comparable 2) was selected by Defendant and given "secondary" weight by Norling. (*Id*.)

/ / /

Norling's sales comparison approach consists of one sale that he gave "secondary" weight. "Usually, one sale does not make a market." *Truitt Brothers, Inc. v. Dept. of Rev.*, 302 Or 603, 609, 732 P2d 497 (1987). In this case, there is no evidence to conclude that one sale does make a market. Norling's sales comparison approach is incomplete and does not support his determination of the subject property's real market value.

Culver selected five sales with one of the sales a resale of a property located in Eugene, Oregon (comparable 3, 5). (Def's Ex A at 77.) Two of Culver's five sales were "fee simple sales" and three sales were "leased fee sales." (*Id*. at 75.) In her appraisal report, Culver addressed the difference between fee simple and lease fee, stating:

> "A leasehold interest exists when there is a difference between market lease rates and terms and existing lease rates and terms. When there is no difference, the leased fee interest is equivalent to the fee simple interest. Accordingly, no adjustments were required for property rights conveyed."

(*Id*.) Culver offered no evidence other than her reference to "discussions with the various buyers, sellers, real estate agents, County Assessors' staff" to support her conclusion that "the various lease rates and terms, *where available, appeared* to reflect market conditions at the time of sale." (*Id*.) (Emphasis added.)

In determining the adjusted sale prices for each sale, Culver's approach differed from Norling in that she extracted the land value from the total sale price before making adjustments to the remaining improvement value. Culver "extracted" the land value by relying on the tax roll values and developing a relationship between the land tax roll real market value and the total tax roll real market value. The extraction method uses a combination of actual sales data and tax roll values to estimate land value. This court has previously noted the Oregon Department of Revenue's warning that "[t]he extraction method is less reliable than the direct comparison approach and should be used with caution." *Coos County Assessor v. Smith*,

TC-MD No 040520D, WL 2055955 at *10 (Aug 19, 2005) (citing Oregon Department of Revenue, 1993 Appraisal Methods for Real Property at 1). The method should be used with a large sample of properties within the same neighborhood to give a reliable range of values. *Renzo II, LLC, v. Clackamas County Assessor*, TC-MD No 130076D (Dec 3, 2013), (referencing Oregon Department of Revenue, Appraisal Methods for Real Property, revised July 2003.) Defendant relied on a narrow sample, selecting four comparable properties. *The Appraisal of Real Estate* concludes that the extraction method is "applicable when [t]he contribution of the improvements to total property value is generally small and relatively easy to identify" and is most effective "when the improvements are new, their value is known and there is little to no depreciation from any cause." Appraisal Institute, *The Appraisal of Real Estate* 363 (13th ed 2008). The improvement value of each of the four comparable properties selected by Culver in relation to total adjusted sale price ranged from between 50.9 percent to 67.0 percent. (Def's Ex A at 77-79.) The improvement value of each comparable property contributed substantially to the total unadjusted and adjusted sales price. In the case before the court, the effectiveness of the extraction method is questionable and generally not applicable to the subject property.

Even though the land tax roll value was extracted from the total sale price, Culver made land related adjustments, specifically "land-to-building ratio, coverage ratio, and parking ratio" to the unadjusted improvement sales price. (Def's Ex A at 80.) Culver did not explain why those adjustments were made to the allocated improvement sale price and no adjustment was made to the extracted land value.

Like Norling, Culver's sales comparison approach is incomplete and does not provide the necessary detail or supporting calculations to adequately substantiate its applicability.

/ / /

Norling and Culver selected properties with buildings that were substantially smaller than the subject property. Norling's one comparable property that was also selected by Culver stated a building size of 66,085 square feet. Culver's other selected comparable properties reported building sizes ranging from 43,057 square feet to 69,358 square feet. (Def's Ex A at 77-79.) The subject property is 103,909 square feet. Culver stated that all comparable properties were superior to very superior in size to the subject property. (*Id*. at 81.) Culver acknowledged that "[l]arger buildings generally sell for a lower unit price than smaller ones" and then selected a price per square foot in excess of her computed average for smaller sized buildings. Culver's conclusion is not supported by her testimony.

The court accepts the parties' conclusion that there are a limited number of sales of big box stores locally. There is a substantial national big box market. The parties presented no evidence of that market adjusted for location.

In sum, the court concludes that the parties' comparable sales approach is inconclusive in determining the subject property's real market value.

C.      *Income Approach*

Both parties presented the court with analysis and estimates of real market value based on the income approach. "Any property that generates income can be valued using the income capitalization approach." *NYEI v. Umatilla County Assessor*, TC-MD No 100605D at 19 (Jan 13, 2012) (citing Appraisal Institute, *The Appraisal of Real Estate* 447 (13th ed 2008)). "In the income capitalization approach, an appraiser analyzes a property's capacity to generate future benefits and capitalizes the income into an indication of present value. The principle of anticipation is fundamental to the approach." *Id*. (citing *The Appraisal of Real Estate* at 445.) "Anticipation is defined as 'the perception that value is created by the expectation of benefits to

be derived in the future.' " *Id*. (citing *The Appraisal of Real Estate* at 35.) Because the primary use of the subject property is leased for commercial business, both parties determined the subject property's real market value using the income approach.

Both parties relied on the direct capitalization method to determine expected future income. "The direct capitalization method * * * focuses on two key components: (1) the capitalization rate * * * and (2) net operating income * * *." *Allen v. Dept. of Rev*. (*Allen*), 17 OTR 248, 253 (2003). Net operating income "is the currently expected net income of a property after all operating expenses are deducted from gross income." *Id*. at 254 (citation omitted). "To calculate the [net operating income] appraisers look at historical gross income and expenses for the subject, adjusted by reference to market data." *Id*. at 254.

There are two important differences between the appraisal reports. Culver developed an income approach for both an absolute net lease structure and a triple net lease structure, while Norling only developed the income approach for a triple net lease structure and considered concessions for tenant improvements. Both Norling and Culver placed substantial weight on the income approach when they determined their reconciled values. (Ptf's Ex 1 at 46; Def's Ex A at 8.)

1.     *Potential Gross Income*

Both appraisers researched market lease comparables to determine an appropriate rent rate for the subject property. Culver developed two different conclusions of real market value, using a triple net lease structure and an absolute net lease structure. (Def's Ex A at 100.) Norling determined the subject property's real market value using a triple net lease structure. (Ptf's Ex 1 at 39; Ptf's Rev Ex 1 at 35.) The initial question is the appropriate lease structure. OAR 150-308.205-(A)(2)(g) states that "[t]he income to be used in the income approach must be

the economic rent that the property would most probably command in the open market as indicated by current rents being paid, and asked, for comparable space." Norling selected six triple net leases. Culver selected nine triple net leases and one absolute net lease. Culver stated in her appraisal that her absolute net lease comparable "was the only one I could confirm as an absolute net lease." (Def's Ex A at 93.) The leases selected by Norling and Culver support the conclusion that the "economic rent that the property would most probably command" would be a triple net lease.

Norling selected six triple net lease rates ranging from $7.75 per square foot to $15.00 per square foot. (Ptf's Ex 1 at 32, 36.) Norling adjusted his rent rates for "a comparable market standard free rent of 3 months and a tenant improvement allowance of $0/SF." (*Id.* at 31.) After adjusting the rent rates for concessions and tenant improvements, Norling's lease comparables ranged from $8.14 to $10.85. Culver selected nine triple net lease rates, ranging from $10.00 per square foot to $16.77 per square foot. (Def's Ex A at 95-96.) Culver did not make any adjustment for tenant improvements or concessions. (*Id.* at 95.) Both appraisers made adjustments for the physical differences of the comparable properties to the subject property. Norling chose a quantitative approach, while Culver chose a qualitative approach and weighted her unadjusted rates based on the overall qualitative adjustments.

Norling determined an adjusted $8.50 per square foot rent rate and Culver determined an adjusted $12.15 per square foot rent rate. The two rents for properties Culver identified as "equivalent" to the subject property were $11.25 and $10.00. (Def's Ex A at 95.) Culver did not offer an explanation as to why the rent rate she selected was in excess of the two "equivalent" properties' rent rate. Norling's adjusted rent rates including market concessions, specifically "free" rent, ranged from $8.14 to $10.54 per square foot. (Ptf's Ex 1 at 34.) The timing of rent

concessions can make a reduction for concessions moot. For example, if the rent concession occurs only in the first year of a five year lease, the income generated in years after the first year are not reduced by the concession awarded in the first year. Norling reduced the rent rate for each of the comparable properties selected even if the lease was entered into in a year other than the tax year before the court and he provided no evidence to support his approach to distribute the concessions over the term of the lease.

The court accepts Norling's testimony that the market as of the assessment dates dictated rent concessions for those leases entered into in the assessment years. Norling's property adjustments were explained and overall were reasonable except the parking ratio adjustment that included a zero percent adjustment for a 3.3 parking ratio and a minus five percent adjustment for parking ratios that ranged from 4.4 to 8.6. (*Id*. at 34.) The testimony and evidence support a rent rate conclusion of $10.00 per square foot and potential gross rent of $1,039,900 (rounded) for both tax years.

2.      *Vacancy and Credit Loss*

Norling determined that a typical vacancy rate for the market would be five percent, but given the functional issues of the subject property a 10 percent vacancy rate was appropriate. (Ptf's Ex 1 at 36.) Culver determined that the market vacancy rate ranged from 3.80 percent to 7.93 percent. (Def's Ex A at 97.) Culver concluded that the subject property would experience a higher than average vacancy rate based on it being a "big box retail store" and a vacancy rate of 9.5 percent was appropriate as of January 1, 2012, and 8.5 percent was appropriate as of January 1, 2013. The vacancy rates determined by the parties are relatively close to each other. Based on the subject property's size, the court agrees that the vacancy rate would be towards the higher end of the range and accepts Norling's vacancy rate of 10 percent for both tax years.

Norling concluded that in addition to the loss of rent income the subject property would incur a loss of "other income." (Ptf's Ex 1 at 39.) Norling did not testify about how he concluded that the subject generated other income nor submit any evidence substantiating his claimed reduction. The court makes no adjustment to potential gross income for a loss of other income.

3.      *Operating Expenses*

Norling determined operating expenses to be $239,162, or 23.7 percent of his calculated effective gross income. (Ptf's Ex 1 at 37.) Norling offset the operating expenses with tenant reimbursement (triple net lease) in the amount of $239,162, resulting in an effective expense rate of zero percent. (Ptf's Ex 1 at 39.) In his appraisal report, Norling described his expense analysis as "[r]emaining consistent with the triple net [lease] expense structure used in this analysis[,] real estate taxes, property insurance and common area maintenance are treated as reimbursable expenses. Non-reimbursable expenses * * * include management fees and reserves for replacement." (*Id.* at 37.) When Norling's expenses for management fees and reserves are treated as the only non-reimbursable expenses, Norling's expense ratio is two percent. (Ptf's Ex 1 at 39.) Norling made no adjustment for non-reimbursable expenses.

Culver's expenses were $59,714, or five percent of her calculated effective gross income. Culver did not state what she included in her expense calculations, instead stating that she relied on "market research" and "concluded that an expense ratio of 5.0% was appropriate" for both tax years. (Def's Ex A at 98.)

Norling's expense ratio was based on the subject property's "single tenant design" resulting in a "nominal management expense" and a lower reserve expense based on the subject

property's "relatively recent construction."[5] (Ptf's Ex 1 at 37.) Culver's slightly higher expense ratio was based on "expense ratios for retail shopping centers." (Def's Ex A at 98.) Norling's expense ratio was more closely tied to the subject property and the court accepts his two percent non-reimbursable expense ratio.

4. *Capitalization Rate*

Norling and Culver relied on local, regional, and national capitalization rates derived from the sale of comparable properties. (Ptf's Ex 1 at 37-38; Def's Ex A at 98-99.) Norling stated that the "regional cap rate comparables indicate a range from 6.77% to 9.87%, and average 8.19%." (Ptf's Ex 1 at 37.) He concluded that within the regional data the subject property was "most comparable with the sale of the upper end of the middle tier," showing capitalization rates of 8.82 percent and 8.89 percent. (*Id*.) Norling stated that "national cap rate comparables indicate a range from 6.78% to 8.87%, and average 7.56%." (*Id*. at 38.) In her appraisal report, Culver stated that "[l]ooking just at the data that best reflected the subject property type and location, OARs ranged from 6.50% to 7.50% with an average of 7.13%. OARs as of January 1, 2013 ranged from 6.25% to 8.20% with an average of 7.30%." (Def's Ex A at 98.) Culver stated that "CoStar provides the most comprehensive data available segregating OAR data based on property size." (*Id*. at 99.) Culver presented data for both tax years, noting that "[a]ll retail, 100,000 SF and Over averaged 8.3 percent in each tax year." (*Id*.) Her data supported a conclusion that there was no change or a slight upward change in capitalization rates between the 2012-13 tax year and 2013-14 tax year. Norling concluded an 8.75 percent capitalization rate and Culver determined a 7.75 percent capitalization rate. Both appraisers' conclusions were well supported and reasonable. The appraisers have accurately determined a reasonable range of

---

[5] The subject property was constructed in 1989 and remodeled in 2006 and 2011.

capitalization rates. The court concludes that an 8.25 percent capitalization rate is appropriate for the 2012-13 tax year and 2013-14 tax year.

Norling increased his computed capitalization rate for an adjustment to account for property taxes that were incurred during vacancy and not reimbursed. (Ptf's Ex 1 at 38.) Norling concluded that a 0.12 percent adjustment was appropriate for the 2012-13 tax year. Culver did not include a capitalization rate adjustment for property taxes. The court agrees with Norling that a .12 percent capitalization rate adjustment for property taxes is appropriate when the subject property is not leased and there is no reimbursement consistent with the triple net lease structure. The court determines a capitalization rate of 8.37 percent for the 2012-13 and 2013-14 tax years.

5.    *Conclusion of Value*

Based on the above findings the court determines a potential gross income of $1,039,900, rounded. The court determines a vacancy and credit loss of 10 percent, and non-reimbursable expenses of two percent, resulting in an effective gross income of $915,000, rounded. The court determines a capitalization rate, including property taxes adjustment, of 8.37 percent. The overall conclusion of real market value using the income approach is $10,900,000, rounded.

## III. COSTS AND DISBURSEMENTS FACTS AND ANALYSIS

The Magistrate Division has discretionary authority under ORS 305.490(2) to award costs and disbursements to the prevailing party. *Wihtol I v. Dept. of Rev.* (*Wihtol I*), 21 OTR 260, 267 (2013). The Magistrate Division promulgated a rule, Tax Court Rule-Magistrate Division (TCR-MD) 16,[6] setting forth the procedure for a prevailing party to request costs and disbursements. As required under TCR-MD 16C(1), Plaintiff filed a summary cost statement on

---

[6] Plaintiff's motion was filed under TCR-MD 19 (2014). TCR-MD 19 (2014) was renumbered to TCR-MD 16 (2015), effective Jan 2, 2015.

December 22, 2014, requesting that the court award it costs and disbursements totaling

$14,354.17. TCR-MD 16C(1) states that "[w]ith the exception of the filing fee, proof of claimed

costs and disbursements must be attached to the statement. Plaintiff did not attached proof of the

claimed costs and disbursements. Pursuant to TCR-MD 16C(2)(a), Defendant filed an Objection

to Statement of Costs (Objection) on January 2, 2015, stating that:

> "Plaintiff has not provided the court the requisite detailed statement of costs and disbursements as required by TCR-MD 19 C(1) to determine if the costs are appropriate or otherwise substantiate the claim. On that basis, the court should deny costs requested, other than the filing fee, if the court allows costs and disbursements."

(Def's Objection at 3.) Plaintiff filed a request to file Plaintiff's Response to Defendant's

Objections to Statement of Costs (Response) on January 7, 2015. TCR-MD 16C(2)(b). Neither

party requested that the court schedule a hearing "to consider issues and evidence related to the

request for costs and disbursements[.]" TCR-MD 16C(3).

Under TCR-MD 16B, "costs and disbursements may be allowed to the prevailing

party[.]" "Prevailing party" in the context of an award of attorney fees is currently defined by

statute, ORS 20.077, which was promulgated in 2001. That statute currently states, "the

prevailing party is the party who receives a *favorable* judgment or arbitration award on the claim.

If more than one claim is made in an action or suit * * * the court * * * shall[] (a) [i]dentify each

party that prevails on a claim * * *." ORS 20.077 (2013) (emphasis added). Two cases are

particularly useful in defining "favorable" under ORS 20.077. The court in *Eagles Five, LLC v.*

*Lawton*, stated that, "'it does not necessarily follow that, merely because a party does not obtain

all the relief sought, a party is not a prevailing party[.]' " 250 Or App 413, 427, 280 P3d 1017

(2012) (quoting *Beggs v. Hart*, 221 Or App 528, 536, 191 P3d 747 (2008)). The court in *Beggs*

*v. Hart* stated that "[t]o determine who is the prevailing party on each claim, a court must weigh

'what was sought by each party against the result obtained.' " 221 Or App 528, 537-38, 191 P3d

747 (2008) (quoting *Lawrence v. Peel*, 45 Or App 233, 243, 607 P2d 1386 (1980)).  In the absence of a "prevailing party" definition imbedded within ORS 305.490, the Oregon Tax Court has looked to the "prevailing party" definition under ORS 20.09.  *E.g. Waterbury v. Dept. of Rev.*, 11 OTR 314 (1989).  ORS 20.096 (1), (5) (1997) stated:

> "In any action or suit on a contract, where such contract specifically provides that attorney fees and costs incurred to enforce the provisions of the contract *shall be awarded to one of the parties, the prevailing party*, whether that party is the party specified in the contract or not, at trial or on appeal, shall be entitled to reasonable attorney fees in addition to costs and disbursements.

> "* * * * *

> "Except as provided in ORS 20.015, as used in this section and ORS 20.097 *'prevailing party' means the party in whose favor final judgment or decree is rendered*."

Emphasis added.

There is no question that Plaintiff received a favorable decision, specifically a reduction in the subject property's real market value and assessed value.  Plaintiff is the prevailing party in this matter.

The question is whether the court should, in its discretion, award Plaintiff the requested costs and disbursements. *See Wihtol*, 2014 WL 274126 at *4 ("[t]he award of costs and disbursements is entirely discretionary with the court." (citations omitted)).  TCR-MD 16C(1) states that with the exception of a request for filing fee, "proof of claimed costs and disbursements *must* be attached to the statement.  (emphasis added.)  Plaintiff failed to comply with the court's rule, omitting any substantiation for the claimed costs and disbursements.  Plaintiff's request is denied with the exception that Plaintiff's request for filing fee which need not be substantiated by Plaintiff is granted.

/ / /

/ / /

IV. CONCLUSION

After considering the evidence and testimony the court concludes that the sales comparison and cost approaches are not good indicators of the subject property's real market value. Based on the testimony and evidence presented, the income approach is the only reliable approach to determine the subject property's real market value. Using the income approach the court finds that the subject property's real market value was $10,900,000 for the 2012-13 tax year and 2013-14 tax year. Now, therefore,

IT IS THE DECISION OF THIS COURT that the real market value of the subject property, identified as Account R66421, was $10,900,000 for the 2012-13 tax year.

IT IS FURTHER DECIDED that Plaintiff's request for filing fee is granted.

IT IS FURTHER DECIDED that Plaintiff's request for costs and disbursements other than the filing fee is denied.

IT IS FURTHER DECIDED that Plaintiff's request to file its Response to Defendant's Objections to Statement of Costs (Response) is granted.

Dated this ___ day of January 2015.

_____
JILL A. TANNER
PRESIDING MAGISTRATE

*If you want to appeal this Final Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed.*

*This document was signed by Presiding Magistrate Jill A. Tanner on January 14, 2015. The court filed and entered this document on January 14, 2015.*